**In re DAYTON TITLE AGENCY, INC., Debtor–In–Possession.**

**Dayton Title Agency, Inc., et al., Plaintiffs,**

v.

**The White Family Companies, Inc., et al., Defendants.**

**Bankruptcy No. 99–35768.
Adversary No. 99–3664.**

United States Bankruptcy Court, S.D. Ohio, Western Division at Dayton.

April 25, 2003.

---

Sharyn J. Bennett, Robert B. Berner, Stephen K. Dankof, Donald F. Harker, III, John G. Jansing, Thomas R. Noland, Walter Reynolds, Charles D. Shook, Dayton, OH, David S. Cupps, Columbus, OH, Stewart H. Cupps, William B. Fecher, Jerome J. Metz, Jr., Cincinnati, OH, James P. Hickey, Jr., Oakwood, OH, Roger E. Luring, De Wayne Smith, Troy, MI, Ronald S. Pretekin, Dayton, OH, Frederick L. Ransier, III, Columbus, OH, for creditor.

Anne M. Frayne, Dayton, OH, for debtor.

WILLIAM A. CLARK, Bankruptcy Judge.

### DECISION OF THE COURT, FOLLOWING REMAND, GRANTING PARTIAL SUMMARY JUDGMENT TO THE PARTIES AS FOLLOWS:

1) GRANTING SUMMARY JUDGMENT TO DEFENDANTS THE WHITE FAMILY COMPANIES, INC. AND NELSON WENRICK WITH RESPECT TO THE THIRD PARTY BENEFICIARY FUNDS OF $722,101.49 WHICH THE COURT CONCLUDES ARE NOT PROPERTY OF THE DEBTOR'S ESTATE;

2) DETERMINING THAT AN ISSUE OF FACT EXISTS REGARDING THE OWNERSHIP OF $20,747.13 IN FUNDS WITHIN THE TRUST ACCOUNT AT THE TIME OF THE TRANSFERS TO DEFENDANTS, THE WHITE FAMILY COMPANIES, INC. AND NELSON WENRICK, AND DENYING SUMMARY JUDGMENT TO ALL PARTIES WITH REGARD TO THESE FUNDS;

3) GRANTING SUMMARY JUDGMENT TO PLAINTIFF DAYTON TITLE AGENCY, INC. ON RECOVERY OF THE $4,142,151.38 IN PROVISIONAL LOAN PROCEEDS AS A FRAUDULENT TRANSFER UNDER OHIO'S UNIFORM FRAUDULENT TRANSFER ACT;

4) GRANTING SUMMARY JUDG-MENT TO DEFENDANTS, THE WHITE FAMILY COMPANIES, INC. AND NELSON WENRICK, ON THE ISSUE OF DAYTON TITLE AGEN-CY, INC. BUSINESS TRUST'S INE-LIGIBILITY FOR SEPARATE BANKRUPTCY PROTECTION;

5) DETERMINING NATIONAL CITY BANK'S MOTION FOR SUMMARY JUDGMENT TO BE MOOT; AND

6) GRANTING DAYTON TITLE AGENCY, INC.'S REQUEST FOR PREJUDGMENT INTEREST AND COURT FILING COSTS.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the standing General Order of Reference entered in this district. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(E) and (H). The following decision is determined in accordance with Fed. R. Bankr.P. 7056.

On May 15, 2001, this court determined, on summary judgment, that the undisputed facts in this adversary proceeding supported two conclusions. First, Dayton Title Agency, Inc. Business Trust ("DTABT") was not a "business trust" for bankruptcy purposes and, thus, was ineligible for separate bankruptcy protection from the Debtor–in–Possession, Dayton Title Agency, Inc. ("Dayton Title"). In addition, the court concluded that Dayton Title was entitled to recover $4,885,000.00 transferred to Defendants the White Family Companies, Inc. ("WFC") and Nelson D. Wenrick ("Wenrick") in October of 1999 from Dayton Title's trust account with Plaintiff National City Bank. The court held that the funds were recoverable as a fraudulent conveyance under the Ohio Uniform Fraudulent Transfer Act ("UFTA"), Ohio Rev.Code §§ 1336.01 et seq. Significant to the court's conclusion was its determination that Dayton Title had a property interest in the funds, making them recoverable on behalf of the estate, even though the funds were transferred from an escrow account used to hold funds for the benefit of third parties. The court made this determination because Dayton Title exerted control over the escrow funds and used them for a purpose other than that intended by the third parties. Furthermore, the transfers diminished assets available for distribution to creditors of the estate.

The parties appealed many of this court's determinations, including its decision on summary judgment, to the United States District Court for the Southern District of Ohio. On appeal, Judge Rice affirmed many of the this court's prior determinations, but vacated and remanded this court's decision on summary judgment relating to whether DTABT was in fact a "business trust" as the term is used in bankruptcy and whether the transfer of funds to WFC and Wenrick constitutes a fraudulent conveyance under the UFTA.

### FACTUAL AND PROCEDURAL BACKGROUND

**A. Uncontested Facts Adopted from Prior Decision**

In general, the facts from this court's decision prior to remand remain uncontested and, thus, the court adopts those findings in this decision on remand. Debtor–in–Possession, Dayton Title, whose bankruptcy case is jointly administered with the related DTABT bankruptcy, was a Dayton area title agency founded in 1973. [Adv. Doc. # 67–1, Depo. of Alex Katona ("Katona Depo."), p. 42.] Beginning in 1996, Dayton Title conducted closing agent services on real estate transactions for Krishan Chari ("Chari"), a real estate broker affiliated with Don Wright Realty. [Adv. Doc. # 70–1, Depo. of Pam Folino ("Folino Depo."), pp. 25–27.] Many of

these transactions involved Chari channeling funds through Dayton Title's trust accounts which were used primarily to hold third party escrow funds related to the title agency's real estate closings. [*Id.*, pp. 17–18.]

Beginning in November of 1998, Dayton Title experienced difficulties collecting funds from Chari to cover disbursements made at his direction through the trust accounts. In at least one transaction, Dayton Title disbursed funds on behalf of Chari before Chari made a deposit into its account. [Adv. Doc. # 129–1, Ex. 3.] In connection with this same transaction and many others, Chari's checks were returned for insufficient funds. [*Id.*, Exs. 3, 5, 11–18, 20–21, 23–24.] Some of the bounced checks resulted in substantial overdrafts in a Dayton Title trust account. [Adv. Doc. # 130–1, Ex. 70 at NCB 00277 and Adv. Doc. # 131–1, Ex. 71 at NCB 00255.]

At the center of the present dispute are transactions conducted at Chari's direction through one of Dayton Title's trust accounts with National City Bank involving Chari's real estate investment enterprise, Invesco, LLC. [Folino Depo., pp. 27–28.] Invesco was run by Chari and his partner Michael Karaman. [*Id.*] Beginning in December of 1998, two separate entities, WFC and Wenrick, provided short term financing, called bridge loans, to Invesco for purported real estate transactions. [Adv. Doc. # 52–1, Depo. of Timothy White ("White Depo."), pp. 28–30; Adv. Doc. # 53–1, Depo. of Nelson Wenrick ("Wenrick Depo."), pp. 14–29.] The purpose of the loans, each involving over one million dollars, was to facilitate Invesco in the purchase of commercial real estate for attractive prices. [White Depo., p. 30; Adv. Doc. # 132–1, Ex. 95.] The duration of each loan was only 30 or 45 days, long enough for Invesco to procure permanent financing. [Adv. Doc. # 90–1, Depo. of

Dave Alexander ("Alexander Depo."), p. 148; White Depo., pp. 30, 34–36; Wenrick Depo., p. 29.] These loan transactions were usually closed at Dayton Title's facilities [Alexander Depo., pp. 34–35, 53, 68, 87–88, 101, 113; Wenrick Depo., p. 16] and were evidenced by notes signed by Michael Karaman on behalf of Invesco [Adv. Doc. # 132–1, Ex. 95]. Each note carried a second signature of Michael Karaman as personal guarantor. [*Id.*]

Between December 1, 1998 and July 12, 1999, WFC made five bridge loans to Invesco ranging from $1,900,000.00 to $3,200,000.00. [*Id.*] In a completely separate transaction, Wenrick furnished a $1,200,000.00 bridge loan to Invesco on August 4, 1999. [*Id.*] Each loan transaction was carried out by the lender depositing the funds into one of Dayton Title's accounts. [Adv. Doc. # 132–1, Exs. 99–103, 105.] These loans were paid back in full, but not always before the due dates. [Adv. Doc. # 132–1, Ex. 95; Adv. Doc. # 103–1, Exs. G, N, T, AA, GG; Wenrick Depo., pp. 235–236.]

On September 3, 1999, WFC and Wenrick each provided a final bridge loan to Invesco of $3,200,000.00 and $1,600,000.00 respectively. [Adv. Doc. # 132, Ex. 95.] The loans were made in connection with the supposed purchase of property containing a Staples retail office supply store. [Wenrick Depo., pp. 242–244; White Depo., pp. 144–145.] Like the previous loans, these were evidenced by notes containing Michael Karaman's signature as President of Invesco and a second signature of Michael Karaman as personal guarantor of the loans. [Adv. Doc. # 132–1, Ex. 95.] According to the notes, Invesco was to repay the principal and interest on the short-term loans on or before October 3, 1999. [*Id.*]

Soon after the loans were past due, WFC and Wenrick were repaid with

checks drawn on a Texas IOLTA account of John Lewis. [Adv. Doc. # 103–1, Ex. OO; Alexander Depo., pp. 118–119; Wenrick Depo. pp. 24–25.] Both checks were returned for insufficient funds. [Wenrick Depo. pp. 24–25; Alexander Depo., pp. 122–123.]

Subsequently, on October 19, 1999, Krishan Chari had a $5,000,000.00 check deposited into Dayton Title's trust account with National City Bank for the purpose of paying WFC and Wenrick. [Adv. Doc. # 99–1, App. A, Ans. to Interrog. 3(c); Adv. Doc. # 132–1, Exs. 97 and 98.] The check was purportedly drawn on a DCW Investments account at Oak Hill Bank. [Id.] The teller at National City Bank did not place a hold on the check Chari deposited. [Adv. Doc. # 132–1, Ex. 109.] On that same day, pursuant to Chari's instructions, Dayton Title issued a check payable to WFC in the amount of $3,260,000.00 and a check payable to Wenrick in the amount of $1,625,000.00 from the trust account. [Adv. Doc. # 103–1, Ex. 2, Affidavit of Pam Folino ("Folino Aff."), ¶ 4; Adv. Doc. # 132–1, Ex. 111.] The remaining $115,000.00 from Chari's $5,000,000.00 check was to remain in Dayton Title's trust account for fees payable to Dayton Title for unrelated transactions. [Folino Aff., ¶ 4.]

On October 20, 1999, Tim White presented the WFC check to a teller at National City Bank and obtained an official bank check in return. [White Depo., pp. 154–155; Adv. Doc. # 99–1, App. A., Ans. to Interrog. 3(a).] Wenrick deposited his check in an account at Security National Bank. [Wenrick Depo., pp. 39–45.] Wenrick's check cleared the trust account at National City Bank on October 25, 1999. [Adv. Doc. # 99–1, App. A., Ans. to Interrog. 3(b).]

On or about October 26, 1999, National City Bank received notification that the check deposited by Chari in Dayton Title's trust account was being returned. [Adv. Doc. # 132–1, Ex. 97.] However, WFC and Wenrick's checks were honored by National City Bank prior to the bank's discovery that Chari's check was a forgery drawn on a non-existent account. [Adv. Doc. # 99–1, App. A, Ans. to Interrog. 3(a) through 3(c), 5 and 6.] Chari deposited two subsequent $5,000,000.00 checks into Dayton Title's trust account which also bounced. [Adv. Doc. # 131–1, Ex. 79; Adv. Doc. # 132–1, Exs. 97 and 118.] Consequently, National City Bank made the decision to freeze Dayton Title's accounts on November 4, 1999. [Adv. Doc. # 132–1, Ex. 119.]

Because Chari's checks were returned, the funds in Dayton Title's trust account did not cover the checks written to WFC and Wenrick that were already honored by National City Bank. This chain of events caused Dayton Title's trust account to be substantially overdrawn. According to an account statement, Dayton Title had a negative balance of $4,142,151.38 in the trust account as of November 19, 1999 [Adv. Doc. # 131–1, Ex. 80] indicating that approximately $742,848.62 of the funds transferred to WFC and Wenrick represent money that had been in Dayton Title's trust account at the time of the conveyance. Prior to remand, no party disputed that the funds in the account were third party escrow funds held in trust by Dayton Title. [Adv. Doc. # 129–1, Ex. 2; Folino Depo., pp. 17–18.]

After learning of the forgery and the loss of over $ 4,000,000.00 in the trust account, Dayton Title Agency, Inc. and Dayton Title Agency, Inc. Business Trust filed separate Chapter 11 bankruptcy petitions on November 8, 1999. On November 10, 1999, both entities initiated adversary

proceedings [1] against WFC and Wenrick to recover the $4,885,000.00 paid out of Dayton Title's trust account as fraudulent transfers under provisions of the Bankruptcy Code and Ohio statutory law. National City Bank has been joined as a plaintiff-intervenor in the recovery of the funds.

### B. Additional Facts From Renewed Requests for Summary Judgment

To supplement the uncontested facts from their earlier briefings, the parties expound on additional facts submitted with their renewed requests for summary judgment after remand.

In its initial supplemental brief on remand, Dayton Title argued that all of the funds in the trust account at the time of the transfers to WFC and Wenrick, totaling $742,848.62, were third party funds held in trust by Dayton Title. In its responsive brief, however, Dayton Title argues for the first time that $20,747.13 in the account at the time of the transfers was not being held in trust, but was money both legally and equitably owned by Dayton Title. [Adv. Doc. # 285–1, p. 4.] According to Dayton Title, the money represents fees earned from third parties or expenses repaid. [*Id.*] To support this argument, Dayton Title attaches an affidavit of Anne Frayne and a spreadsheet dated November 3, 1999 documenting the amount due to Dayton Title in checks written from the trust account that allegedly did not clear. [Adv. Doc. # 285–1, attached Aff. of Anne Frayne and Ex. C.] In response, Defendant Wenrick notes that the bank continued to honor checks up until the time that the account was frozen on November 4, 1999. [Adv. Doc. # 290–1,

p. 13.] The spreadsheet does not clarify that the checks written to Dayton Title were, in fact, dishonored. [*Id.*] Furthermore, Defendant Wenrick argues that Dayton Title withdrew approximately $1,660,721.99 in funds before the bank's freeze could be implemented and selectively disbursed the funds according to its own interests. [*Id.*, p. 14.] Defendant Wenrick asserts that if Dayton Title was owed $20,747.13 from the trust account, it should be deemed to have been part of the $1,660,721.99 withdrawn from the bank. [*Id.*]

As additional proof of the nature and amount of National City Bank's provisional loan, the bank relies on its proof of claim filed in this bankruptcy case and the attachments thereto. (See National City Bank Proof of Claim # 48 filed April 11, 2000). The claim is for a "checking account overdraft," totaling $4,142,151.38. *Id.* Significantly, the bank asserts no security interest in the proceeds from the loan. *Id.* Attached to the proof of claim is National City's Rules for Business Accounts effective February 1, 1999. *Id.* These rules explain provisional credit as well as when a security interest arises in relation to the credit given. Rule 13 states that "Depositor grants a security interest in the Account to Bank for any and all indebtedness owed by Depositor to Bank or to Bank's affiliates, however and whenever incurred or evidenced." *Id.*

With respect to the issue of whether DTABT is a business trust, Dayton Title focuses on the amount of business conducted through DTABT's trust accounts. It is undisputed that the majority of funds, representing third party funds, received by Dayton Title passed through the primary

---

1. Because they contain identical claims against WFC and Wenrick, the two adversary proceedings of Dayton Title Agency, Inc. (Adv. # 99–3664) and Dayton Title Agency, Inc.

Business Trust (Adv.# 99–3663) have been jointly administered for procedural purposes with filings located in Adv. # 99–3664.

trust account of DTABT. [Adv. Doc. # 129–1 through 131–1, Exs. 36–80 to Defs. Motion for Summ. Jud.] In fact, more transactions occurred in the DTABT accounts than in the corporate operating accounts for Dayton Title. [Adv. Doc. # 138, Ex. 3, Affidavit of Alex Katona ("Katona Aff."), ¶ 3.] The checks passing through the trust account include the forged check from Chari totaling $5,000,000.00. [Adv. Doc. # 99–1, App. A, Ans. to Interrog. 3(c); Adv. Doc. # 132–1, Exs. 97 and 98.]

All of the parties have renewed their requests for summary judgment and filed supplemental briefs asserting that the essential facts to the resolution of this adversary proceeding remain undisputed. After reviewing the supplemental briefs, and other relevant documents, the court is prepared to render its decision.

## LEGAL ANALYSIS

### A. Summary Judgment Standard

The appropriate standard to be used by the court to address the motions for summary judgment filed upon remand is contained in Fed.R.Civ.P. 56(c) and incorporated in bankruptcy adversary proceedings by reference in Fed. R. Bankr.P. 7056. Rule 56(c) states in part that a court must grant summary judgment to the moving party if:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). In order to prevail, the moving party, if bearing the burden of persuasion at trial, must establish all elements of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986). If the burden is on the non-moving party at trial, the movant must: 1) submit affirmative evidence that negates an essential element of the non-moving party's claim; or 2) demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.* at 331–32, 106 S.Ct. 2548. Thereafter, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 586–88, 106 S.Ct. 1348.

### B. Analysis of Whether the Funds Transferred to WFC and Wenrick Represent Property of Dayton Title's Estate

Prior to remand, Dayton Title requested summary judgment asserting that the funds transferred to WFC and Wenrick from the Dayton Title trust account were recoverable as fraudulent transfers under the Ohio Uniform Fraudulent Transfer Act ("UFTA"), Ohio Rev.Code §§ 1336.01 *et. seq.* Avoidance of a transfer under state fraudulent transfer laws is permitted by the "strong arm" provisions of the Bankruptcy Code found in 11 U.S.C. § 544. *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 697 n. 3 (6th Cir.1999). Under § 544, a bankruptcy trustee, or a debtor-in-possession acting with the powers of a trustee, steps into the shoes "of a creditor in order to nullify transfers voidable under state fraudulent conveyance acts for the benefit of all creditors." *Id.*

█ As a threshold issue to recovery under § 544 and state law, Dayton Title was required to prove that the transfer involved a property interest of the Debtor. 11 U.S.C. § 544(b). Consequently, the issue became whether the funds transferred to WFC and Wenrick from Dayton Title's trust account were property of Dayton Title.

This court initially examined the issue under a conduit theory. *See McLemore v. Third National Bank in Nashville (In re Montgomery)*, 983 F.2d 1389, 1395 (6th Cir.1993); *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181–82 (11th Cir.1987). Under this theory, an account used as a conduit of third party money to pay selected creditors does not give a debtor an interest in the account's funds while a debtor who exercises independent control over the funds may obtain a recoverable interest.[2] *Id.*

On appeal, the District Court determined that this court applied the wrong legal standard in its analysis of the funds transferred to WFC and Wenrick. The District Court noted that after this court's decision granting summary judgment to Dayton Title, the Sixth Circuit issued *Stevenson v. J.C. Bradford & Company (In re Cannon)*, an opinion which examines whether third party funds flowing through a debtor's trust accounts can be considered property of the debtor's estate and recoverable as a fraudulent transfer. 277 F.3d 838 (6th Cir.2002). The District Court concluded that *Cannon* was directly on point with respect to whether the funds in Dayton Title's trust account constitute property of the Debtor's estate and reversed and remanded the issue to this court in order to apply the standard adopted by the Sixth Circuit.

Upon remand and the parties' renewed requests for summary judgment, this court's analysis must begin with the Sixth Circuit's opinion in *Cannon.* The debtor, Cannon, had been a Tennessee attorney whose practice was mostly limited to real estate closings. *Cannon,* 277 F.3d at 843. In relation to the closings, between $5,000,000.00 and $10,000,000.00 in third party funds flowed through his trust accounts on a monthly basis. *Id.* By the mid–1980's, Cannon began embezzling funds to pay various personal and business expenses. *Id.* He started by misappropriating the "float" in the trust accounts which created a deficiency of approximately $400,000.00 to $500,000.00 in the accounts. *Id.* However, the volume of Cannon's real estate closing busi-

2. From its analysis of the case law prior to remand, the court concluded that when a bank account is used merely as a conduit of third party money, the debtor has no property interest in the account funds. *McLemore v. Third National Bank in Nashville (In re Montgomery)*, 983 F.2d 1389, 1395 (6th Cir.1993); *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181–82 (11th Cir. 1987). Thus, in situations when a third party lends money to a debtor for the intended purpose of paying a selected creditor of the third party, the debtor does not exercise control over, and has no interest in, the earmarked funds channeled through the debtor's account. *Id.* In the case at hand, however, Chari's $5,000,000.00 check, representing the funds to be used by Dayton Title to pay WFC and Wenrick, bounced. Thus, the funds used to pay the selected creditors were not Chari's funds funneled through Dayton Title's account. Instead, WFC and Wenrick were paid from two sources: 1) $742,848.62 in funds held by Dayton Title in its escrow account; and 2) approximately $4,142,151.38 from a provisional loan of National City Bank needed to cover the overdraft created in the account after the escrow funds were exhausted. Under the conduit theory, this court concluded that because Dayton Title paid WFC and Wenrick from these other unintended sources, the trust account was not a mere conduit of Chari's funds. Thus, Dayton Title had a property interest in the funds that could be recovered from WFC and Wenrick on behalf of Dayton Title's estate.

ness concealed the shortfall. *Id.* In October of 1986, Cannon opened a brokerage account with a subsidiary of J.C. Bradford & Co ("J.C.Bradford") to trade commodity futures and began embezzling funds from the escrow accounts to use in the trades. *Id.* at 843–44. However, Cannon did not realize much of a profit and by the spring of 1992, the deficiency in the accounts reached approximately $1,500,000.00. *Id.* at 844. As the losses mounted, Cannon could no longer rely on the float to conceal the deficiency in the escrow account. *Id.* He began holding closing checks to generate float and eventually turned to check kiting to increase the balance in the account. *Id.*

During the year prior to his bankruptcy, Cannon wrote approximately $1,137,500.00 in checks from the escrow accounts to J.C. Bradford for use in commodities trading. *Id.* at 845. However, his losses continued to mount and Cannon's scheme eventually came to an end when United American Bank, the bank holding Cannon's principle escrow account, refused to cover overdrafts or transfer funds among his accounts. *Id.* at 845. Cannon filed for bankruptcy protection in 1994, was disbarred from the practice of law and was sent to prison after pleading guilty in federal court to charges of embezzlement, mail fraud, wire fraud and bank fraud. *Id.* At the time Cannon filed his bankruptcy petition, the deficiency in his escrow accounts was more than $3,500,000.00. *Id.*

The Trustee in Cannon's bankruptcy attempted to recover, from J.C. Bradford and other defendants, the $1,137,500.00 which Cannon transferred from the trust accounts in the year prior to filing the bankruptcy petition. *Id.* at 845–46. The Trustee sought recovery of the funds as a fraudulent transfer under 11 U.S.C. § 548. *Id.* at 846. The Trustee used a CPA to determine the sources of the funds trans-

ferred to J.C. Bradford. *Id.* at 845–46. The funds came from a $12,000,000.00 pool in the trust accounts that were 83% real estate closing funds, 15% check kites, $67,389.77 of Cannon's personal funds and the balance attributed to unknown sources. *Id.* at 846.

The Sixth Circuit rejected the Trustee's efforts at recovery of the $1,137,500.00 and held that the funds in the trust accounts were not property of the debtor's estate under the broad definition provided in 11 U.S.C. § 541. Beginning with an analysis of Supreme Court precedent, the Sixth Circuit noted that property held in an express trust for another does not constitute property of a debtor's estate. *Id.* at 849. The Sixth Circuit looked to state law to determine whether the funds held in Cannon's escrow accounts constitute an express trust. *Id.* at 849–50. Under Tennessee law, an express trust needs, at a minimum, a grantor or settlor who intends to create a trust, a corpus (the subject property), a trustee, and a beneficiary. *Id.* at 850 (noting that when "a person has or accepts possession of personal property with the express or implied understanding that he is not to hold it as his own absolute property, but is to hold and apply it for certain specific purposes or for the benefit of certain specified persons, a valid enforceable express trust exists"). The Sixth Circuit concluded that all of these factors were in place with respect to Cannon's escrow account and, thus it constituted an express trust. *Id.*

The Sixth Circuit analyzed the sources of the funds in the account and concluded that the commingling of funds from different sources did not effect the nature of the account as an express trust under Tennessee law. *Id.* at 851. Even Cannon's personal deposits into the account, to replace stolen funds, did not give Cannon a property interest in the funds. *Id.* The Sixth

Circuit looked to common law principles to determine that Cannon's vain attempt to repay misappropriated funds was presumed to be restitution for his earlier conversion of funds and, thus, these funds remained outside the debtor's estate. *Id.* Furthermore, a debtor who misappropriates funds from an escrow account and controls them for his own purposes does not obtain title to the funds. *Id.* The Sixth Circuit concluded that "[b]ecause Cannon held the funds deposited into his escrow accounts in express trust for his clients, we hold that these monies are not part of his estate in bankruptcy and so [are] not subject to the trustee's avoidance power under section 548." *Id.*

■ Based on the standard adopted by the Sixth Circuit in *Cannon,* and the District Court's instructions on remand, this court must now look to Ohio law[3] to ascertain whether the money transferred to WFC and Wenrick from Dayton Title's trust account was money held in express trust for others. If so, Dayton Title, holding the powers of a trustee, cannot recover the funds on behalf of the bankruptcy estate.

■ Ohio law on trusts is similar to that of Tennessee and embraces many of the common law principles articulated in *Cannon.* With respect to the creation of an express trust, the Ohio Supreme Court has held that:

> . . . to constitute an express trust there must be an explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created, accompanied with an intention to create a trust, followed by an actual conveyance or transfer of lawful, definite property or estate or interest, made by a person capable of making a transfer thereof, for a definite

term, vesting the legal title presently in a person capable of holding it, to hold as trustee for the benefit of a cestui que trust or purpose to which the trust fund is to be applied; or a retention of title by the owner under circumstances which clearly and unequivocally disclose an intent to hold for the use of another.

*Ulmer v. Fulton,* 129 Ohio St. 323, 339–40, 195 N.E. 557, 564 (1935) (further citations omitted); *Hatch v. Lallo,* No. 20642, 2002 WL 462862, at * 1 (Ohio Ct.App. March 27, 2002) (adopting the definition expressed in *Ulmer*). Essential to the creation of an express trust is the intent of the parties to create a trust, the conveyance or transfer of property, and the contemporaneous designation of a beneficiary. *Gottlieb v. Mead Corp.,* 134 N.E.2d 857, 858 (Ohio Ct.App. 1955) (noting that the primary and basic elements of an express trust include a declaration of purpose to create a trust and a designation of a beneficiary or the object of the trust); *Whiting v. Bertram,* 51 Ohio App. 40, 42, 199 N.E. 367, 367–68 (Ohio Ct.App.1935) (holding that a private trust cannot exist without a *cestui que* trust). As long as these elements are present, an express trust can be created under less formal circumstances such as when a person accepts possession of money or property for another with the express or implied understanding that he is not to hold it as his own absolute property, but is to hold and apply it for specific purposes. *Norris v. Norris,* 57 N.E.2d 254, 258–59 (Ohio Ct.App.1943); *Huntington National Bank of Columbus v. Roan,* 43 N.E.2d 769, 773 (Ohio Ct.App.1931).

**1. Application of Ohio Trust Law to the Funds Existing in the Trust Account at the Time of the Transfers**

■ No party disputes that $722,101.49 of the $742,848.62 existing in the trust

---

**3.** All parties agree that the controlling state law in this case is Ohio law.

account at the time of the transfers to Defendants WFC and Wenrick were third party funds held by Dayton Title. Upon examination under Ohio law, the court concludes that these third party funds in Dayton Title's trust account at the time of the transfers to WFC and Wenrick meet the definition of an express trust. Dayton Title created its primary escrow account to set aside and preserve third party money to facilitate real estate closings. Thus, the intention to create the trust is clear. In addition, no party disputes that Dayton Title held this money not as its own, but as a trustee to apply the money for the benefit of designated parties to real estate transactions. Consequently, the third party funds meet the definition of funds held in express trust for others and, under *Cannon*, those funds are excluded from Dayton Title's bankruptcy estate.[4] For these

reasons, summary judgment must be granted to WFC and Wenrick with regard to the third party funds, totaling $722,101.49, that were held by Dayton Title in its escrow account at the time of the transfers.[5]

■ Also existing in the account at the time of the transfers to Defendants WFC and Wenrick was an additional $20,747.13 that Dayton Title claims ownership of for the first time in a responsive memorandum filed after remand. According to Dayton Title, the funds represent fees earned and expenses to be repaid to Dayton Title in connection with real estate closings and its other functions as a title agency. [Adv. Doc. # 285–1, attached Aff. of Anne Frayne and Ex. C.] However, Defendant Wenrick disputes Dayton Title's ownership of the funds. Defendant Wenrick con-

---

4. Dayton Title attempts to argue that under Ohio law, a trustee of an escrow account obtains a property interest in the funds via the trustee's fiduciary duty to preserve and protect the trust property. *Smith v. Fuller*, 86 Ohio St. 57, 62, 99 N.E. 214, 216 (1912). The fiduciary rights and duties of a trustee include the ability to prosecute and defend actions in the interest of the trust's beneficiaries. *See* Ohio R. Civ. P. 17(A); *In re First National Bank of Mansfield*, 37 Ohio St.2d 60, 66, 307 N.E.2d 23, 26 (1974). According to its argument, Dayton Title should be able to use its fiduciary duty toward the escrow funds to recover the funds on behalf of the beneficiaries in bankruptcy as it could outside of bankruptcy under state law. Dayton Title's argument was rejected by the Sixth Circuit in *Cannon* which pointed out the differences between the powers of a trustee in bankruptcy and those of a fiduciary outside of bankruptcy. The Sixth Circuit noted that a trustee in bankruptcy is a creature of statute and has only those powers conferred by the Bankruptcy Code. 277 F.3d at 853. While one power conferred on the bankruptcy trustee is the right to pursue causes of action that the debtor could pursue outside of bankruptcy, this power is limited to causes of action that recover assets for the bankruptcy estate. *Id.* The issue becomes complicated when a debt-

or-fiduciary's cause of action pursuable outside of bankruptcy is on behalf of the third party beneficiaries of an express trust. *Id.* at 853–55. Although a fiduciary of an escrow account may have the ability to recover funds held in trust on behalf of the third party beneficiaries of the trust, those funds would not become part of the fiduciary's bankruptcy estate. *Id.* Because the cause of action to recover trust funds on behalf of third party beneficiaries could not be used to bring assets into the bankruptcy estate directly, the Sixth Circuit held that the bankruptcy trustee lacked standing to pursue the action in bankruptcy. *Id.*

5. Although Dayton Title lacks the power or authority to recover the third party funds held in express trust, the more than thirty (30) third party beneficiaries, who are claimants in Dayton Title's bankruptcy, are not without remedy. As noted in *Cannon*, the beneficiaries of funds held in an escrow account may pursue their own cause of action against Defendants WFC and Wenrick in state court. 277 F.3d at 856. Although the overall effect of requiring these thirty (30) or more beneficiaries to pursue their own causes of action in state court creates a multiplicity of suits, this result is necessitated by *Cannon* and the limits of the bankruptcy court's authority.

tends that Dayton Title withdrew all funds it owned prior to the bank freezing the trust account and that the $20,747.13 is third party money.

The court concludes that Dayton Title's evidence is vague and, at best, creates a dispute of fact regarding the ownership of the $20,747.13 commingled with other funds in the escrow account. Because a genuine issue of material fact exists, the ownership of the $20,747.13 cannot be determined on summary judgment. Consequently, the court will deny all parties summary judgment with respect to the $20,747.13 and whether the transfer of the funds to Defendants WFC and Wenrick constitutes a fraudulent conveyance. The issue must proceed to trial.

### 2. Application of Ohio Trust Law and Article 4 of the UCC to the Provisional Loan

■ The Defendants argue that, in addition to the funds existing in the account at the time of the transfers, National City Bank's provisional loan of $4,142,151.38 constitutes money held in express trust. Essentially, the Defendants argue that all funds traveling through an account labeled a "trust", "IOTA" or "escrow" account become trust funds regardless of their source or purpose. The Defendants base their argument on *Cannon*. In that case, the Sixth Circuit did not differentiate between commingled amounts held in a trust account when it concluded that the entire account constituted an express trust. However, in *Cannon*, the Sixth Circuit determined that all of the commingled money was, in fact, being held for third parties.

277 F.3d at 850–851. Even the deposits made from Cannon's own funds were considered restitution under Tennessee state law and, thus, assumed the characteristics of trust funds. *Id.* at 851. The Sixth Circuit did not directly address the question of how to treat a provisional loan from a bank that travels through a trust account, but is never held in express trust for any specified third party beneficiary.[6]

■ Dayton Title's property interest in the provisional loan must be determined under state law. Under Ohio law, the labeling of an account does not effect the nature of the funds it contains even if those funds are commingled. Ohio courts have held that the commingling of trust funds and nontrust funds does not change the characteristics of either set of funds, at least to the extent that they remain traceable. *See Smith v. Fuller*, 86 Ohio St. 57, 67–8, 99 N.E. 214, 217 (Ohio 1912); *Ginn v. Fulton*, 17 Ohio Law Abs 499, 1934 WL 1764, at *4 (Ohio Ct.App.1934). The fact that general funds are placed into a "trust" account does not make them funds held in express trust for others anymore than the misappropriation of trust funds and their placement into a general account would somehow cause that money to lose its trust fund characteristics, as long as the trust funds can be traced. *Id.*

In other words, the fact that the provisional loan from National City Bank was channeled through a trust account does not make the loan proceeds funds held "in express trust for others." To be considered trust funds, the loan proceeds would have to meet the definition of an express trust under Ohio law including the inten-

---

**6.** The Defendants do note that in *Cannon*, at least some part of the account funds were from kited checks and, thus, may have constituted provisional loans from a bank. However, the Sixth Circuit never addressed how such funds could be considered trust funds, and, even if the question had been directly addressed, the case dealt with the treatment of funds under Tennessee law rather than Ohio law. Consequently, this court finds that *Cannon* is not on point with respect to the treatment of National City Bank's provisional loan.

tion of the parties to create a trust relationship with regard to the funds and the designation of a beneficiary to the funds. No party has demonstrated such evidence.

Instead, the evidence on summary judgment supports that National City Bank provided provisional credit for Chari's check deposited in Dayton Title's escrow account pursuant to the bank's "Rules for Business Accounts" attached to its proof of claim. Chari gave specific instructions to Dayton Title to pay the $4,885,000.00 to WFC and Wenrick. Because Dayton Title acted with regard to Chari's specific instructions, Defendants argue that a trust relationship was created. However, the trust relationship, if one had been created, would have been between Chari and Dayton Title and, then, only to the extent Chari's check resulted in a lawful conveyance of property. Because this did not occur, no trust relationship was created between Chari and Dayton Title.[7]

With respect to the provisional loan provided by National City Bank to cover the negative balance created by Chari's returned check, no evidence of a trust relationship has been presented on summary judgment. National City Bank asserts that pursuant to its Rules for Business Accounts, Dayton Title could have used the provisional loan proceeds for any purpose, or paid the funds to any entity, with the acknowledgment that use of the proceeds created an obligation on the part of Dayton Title to repay the provisional loan. Consequently, the provisional loan by National City Bank created a debt relationship rather than a trust relationship between Dayton Title and National City Bank.

In response, the Defendants argue that even if the provisional loan was not an express trust, Dayton Title cannot recover the loan proceeds because the proceeds represent the collateral of a fully secured creditor. The Defendants assert that National City's secured status arises by operation of Article 4 of the Uniform Commercial Code, codified by an Ohio statute which provides that a "collecting bank has a security interest in an item ... or the proceeds of the item ...[i]n the case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied ...." Ohio Rev.Code § 1304.20(A)(1) (codifying U.C.C. § 4–210(A)(1)). They argue that under the Sixth Circuit's 2001 decision in *First Tennessee Bank*, a separate adversary proceeding in the Cannon bankruptcy case, the Article 4 security interest extends to the proceeds of the provisional credit in whatever form those proceeds take. *See First Tennessee Bank v. Stevenson (In re Cannon)*, 237 F.3d 716, 721 (6th Cir.2001). Because of this security interest, the Defendants argue that Dayton Title had, at best, bare legal title to the proceeds transferred to WFC and Wenrick. Consequently, Dayton Title does not have the power or authority to recover the proceeds on behalf of the secured creditor when the collateral will not be distributed to general unsecured creditors of the estate. *See Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank (In re Consolidated Pioneer Mortgage Entities)*, 211 B.R. 704, 712 (S.D.Cal.1997), *partially rev'd on other grounds*, 166 F.3d 342, 1999 WL 23156 (9th Cir. Jan 13, 1999).

**7.** Clearly, Chari meant to create a trust relationship between himself and Dayton Title with respect to the $5,000,000.00 check deposited in the escrow account. However, one requirement of an express trust is that an actual conveyance or transfer of lawful and definite property occur. *Ulmer v. Fulton*, 129

Ohio St. 323, 339–340, 195 N.E. 557, 564 (1935). In this case, the $5,000,000.00 check was returned because it was drawn on a fictitious account. Consequently, no property was conveyed by Chari and no trust relationship was created.

The court disagrees with the Defendants' argument and concludes that the security interest created by operation of Ohio law is more limited than the Defendants have proposed. The security interest follows the loan proceeds, or other monies, only to the extent that funds remain or are later deposited in a bank account with the collecting bank. *See* Ohio Rev.Code § 1304.20(B) (explaining the "first in, first out" rule). The limit of National City's security interest is further explained in the bank's Rules for Business Accounts. Rule 13 states that "Depositor grants a security interest in the *Account* to Bank for any and all indebtedness owed by Depositor to Bank or to Bank's affiliates, however and whenever incurred or evidenced." (See National City's Rules for Business Accounts attached to Proof of Claim # 48) (emphasis added). Since no funds existed in the account at the time of the bankruptcy filing, and the account has now been closed, National City Bank will never realize a security interest in the proceeds of the provisional loan transferred to Defendants WFC and Wenrick, even if those funds are returned to Dayton Title's bankruptcy estate. Instead, National City Bank has an unsecured claim and this status has been admitted by National City Bank in its proof of claim.

Because National City asserts only an unsecured claim in Dayton Title's bankruptcy case, the provisional loan is treated like any unsecured loan used by a debtor. This asset meets the broad definition of property of the estate under 11 U.S.C. § 541. Consequently, Dayton Title has the power, as Debtor–in–Possession, to recover the proceeds under a fraudulent transfer theory.

### C. Recovery of the Provisional Loan Under the UFTA

The provisional loan proceeds transferred to Defendants WFC and Wenrick meet the definition of property of the estate and, consequently the court must progress with an analysis of whether Dayton Title meets the other elements for recovery of the transfer under the Ohio Uniform Fraudulent Transfer Act ("UFTA"), Ohio Rev.Code §§ 1336.01 *et seq.* This court already determined that Dayton Title met the elements for recovery prior to remand. Because the District Court did not review these other elements on appeal and because the parties provide very little additional analysis within their supplemental briefs, the court adopts its previous conclusion that Dayton Title meets the elements for recovery of the provisional loan as a fraudulent transfer under the UFTA. For the benefit of the parties, the court will reiterate its analysis within this decision.

■ The significant provision of the UFTA is Ohio Rev.Code § 1336.04 which provides, in pertinent part:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Ohio Rev.Code § 1336.04(A). While § 1336.04(A)(1) covers claims of actual fraud, § 1336.04(A)(2) has a broader scope encompassing claims of constructive fraud where the focus is on the effect of the transaction rather than the intent with which it was undertaken. *Aristocrat Lakewood Nursing Home v. Mayne,* 133 Ohio App.3d 651, 667, 729 N.E.2d 768, 780 (Ohio Ct.App.1999). In fact, a constructive fraud claim under § 1336.04(A)(2) may exist even without any intent on the part of the debtor to hinder, delay, or defraud a creditor. *Id.*

Dayton Title focuses specifically on the unreasonably small asset theory of § 1336.04(A)(2)(a). Under this provision, the party attempting recovery must prove that the debtor transferred an interest in its property for less than reasonably equivalent value leaving it with unreasonably small assets compared to the debtor's "historical level of assets or cash flow and current needs." *Mayne,* 133 Ohio App.3d at 668, 729 N.E.2d at 780. This very broad provision does not require proof of any mental state on the part of the debtor. *Id.*

Because the court has already concluded that a property interest of Dayton Title was transferred to WFC and Wenrick, the court need only reiterate its previous analysis with respect to the other two elements.

**1. Dayton Title Received No Reasonably Equivalent Value in Exchange for the Transfer of Funds to WFC and Wenrick**

 In order to prevail on its fraudulent transfer claim under Ohio's UFTA, Dayton Title must establish that it received nothing of reasonably equivalent value in exchange for the transfer of funds to WFC and Wenrick. Ohio Rev.Code § 1336.04(A)(2). To assess whether a challenged transfer is supported by reasonably equivalent value, "courts generally compare the value of the property transferred with the value of that received in exchange for the transfer." *Corzin v. Fordu (In re Fordu),* 201 F.3d 693, 707 (6th Cir.1999). It is not necessary for there to be "mathematical precision" or a "penny-for-penny" exchange in order to establish reasonably equivalent value. *Coan v. Fleet Credit Card Services, Inc. (In re Guerrera),* 225 B.R. 32, 36 (Bankr.D.Conn. 1998). However, courts should keep the equitable purposes behind fraudulent transfer law in mind, recognizing that any significant disparity between the value received and the value surrendered will significantly harm innocent creditors. *Id.*

 With respect to the provisional loan proceeds, Dayton Title demonstrated that the transfer created a negative balance in its trust account and a $4,142,151.38 claim against it by National City Bank. In exchange, Dayton Title asserts that it received nothing of value from WFC and Wenrick. WFC and Wenrick disagree noting that they deposited a total of $4,800,000.00 in Dayton Title's trust account on September 3, 1999 representing the proceeds from their final bridge loans to Invesco. They argue that no documentary evidence supports that Dayton Title disbursed that money. Thus, the funds they initially deposited constitute reasonably equivalent value to what they received in the transfer.

If Dayton Title failed to disburse the $4,800,000.00 in loan proceeds received from WFC and Wenrick, this could amount to reasonably equivalent value for

Dayton Title's loss. However, in response to WFC and Wenrick's argument, Dayton Title submits evidence, in the form of Pam Folino's affidavit, bank records and Dayton Title's Escrow Account Ledgers, demonstrating that the loan proceeds from WFC and Wenrick were, in fact, disbursed. [Adv. Doc. # 136–1, Folino Aff. attached at Ex. B and attached Exs. 1–6.] The $3,200,000.00 in Invesco loan proceeds which Dayton Title received from WFC on September 3, 1999 was wire transferred from the trust account to John Lewis on the same day. [*Id.,* Folino Aff. and attached Exs. 1 and 2.] In addition, Dayton Title disbursed the $1,600,000.00 in Invesco loan proceeds received in two wire transfers from Wenrick as follows: 1) $1,500,000.00 to John Lewis; 2) $34,000.00 to McDuffie Construction Management Group; and 3) $66,000.00 to Invesco. [*Id.,* Folino Aff. and attached Exs. 3–6.] WFC and Wenrick have provided no evidence to contradict these facts. Because Dayton Title retained none of the funds loaned to Invesco by WFC and Wenrick, the loan proceeds do not constitute reasonably equivalent value for Dayton Title's loss.

Next, WFC and Wenrick request the court to consider indirect benefits received by Dayton Title as reasonably equivalent value. WFC and Wenrick note the significant value Dayton Title placed on its business relationship with Chari. Even before the transactions with WFC and Wenrick, Dayton Title allowed Chari to have substantial extensions of credit by floating returned checks with other funds in the trust account in exchange for Chari's continued business. They assert that the transactions involving WFC and Wenrick, channeled through the trust account, enabled Dayton Title to facilitate this business relationship with Chari believed to be financially advantageous.

 WFC and Wenrick are correct that courts should analyze both direct and indirect benefits to a debtor in determining whether reasonably equivalent value has been received. *Enwotwen Indus., Inc. v. Brookstone Limited Partnership (In re Newtowne),* 157 B.R. 374, 378–79 (Bankr. S.D.Ohio 1993). However, the economic value of any indirect benefits must be fairly concrete and quantifiable to merit consideration by the court. *SPC Plastics Corp. v. Griffith (In re Structurelite Plastics Corp.),* 224 B.R. 27, 31 (6th Cir. BAP 1998) (noting that the speculative value of indirect benefits like the opportunity to acquire additional loans or new managerial talent does not constitute fair consideration); *Leonard v. Norman Vinitsky Residuary Trust (In re Jolly's Inc.),* 188 B.R. 832, 843 (Bankr.D.Minn.1995) (noting that the defendant-creditors carry the "burden of production as to the concreteness of the indirect benefit, and its reasonable equivalence of value").

While goodwill and the continuation of business relationships can be indirect benefits to a business debtor, WFC and Wenrick have not attempted to measure or quantify the economic value of Dayton Title's continued relationship with Chari. Instead, they only speculate, without evidentiary support, that the value of Dayton Title's ongoing relationship with Chari is reasonably equivalent to the $4,142,151.38 loss experienced by Dayton Title forcing it to close its doors and seek bankruptcy protection. The court finds this assertion too speculative to merit consideration. Consequently, the court concludes that Dayton Title received no reasonably equivalent direct or indirect benefit for the $4,142,151.38 transferred to WFC and Wenrick.

**2. The Transfer Left Dayton Title with An Unreasonably Small Amount of Assets in Relation to the Transaction**

 The next element of the UFTA requires Dayton Title to demonstrate that

the debtor engaged in a transaction "for which the remaining assets of the debtor were unreasonably small in relation to ... the transaction[.]" Ohio Rev.Code § 1336.04(A)(2)(a). The unreasonably small asset theory under this provision is the broadest kind of fraudulent conveyance claim applying when the "debtor is left with unreasonably small assets, compared to his historical level of assets or cash flow and current needs." *Aristocrat Lakewood Nursing Home v. Mayne*, 133 Ohio App.3d 651, 668, 729 N.E.2d 768, 780 (Ohio Ct. App.1999). Care must be taken, however, not to invalidate "all transfers simply because a debtor subsequently happened to encounter financial problems." *Id.*

Dayton Title's financial problems did not simply occur as a coincidence after the transfer to WFC and Wenrick. Its problems were a direct result of the transfer of funds from the trust account. By transferring the provisional loan proceeds, National City obtained a $4,142,151.38 claim against Dayton Title that did not exist prior to the transfer. The transfer not only depleted Dayton Title's assets, but destroyed its ability to continue in business. The court concludes that the transfer of funds left Dayton Title with unreasonably small assets, so that Dayton Title meets this final element of a fraudulent conveyance under Ohio's UFTA.

### 3. Prejudgment Interest and Costs

Prior to remand, Dayton Title asserted that the estate should be entitled to costs, attorney fees and interest on the award, at the Ohio statutory rate of 10% per annum, calculated from October 19, 1999, the date of the fraudulent transfer to WFC and Wenrick. WFC and Wenrick did not respond to Dayton Title's request in their memoranda prior to remand.

 With respect to prejudgment interest, the Bankruptcy Code does not address such an award in actions to avoid fraudulent transfers. In the absence of a statutory prohibition, a trial court may exercise its discretion to award prejudgment interest taking into consideration the relative equities of the parties and the need to fully compensate the debtor's estate for the use of funds for the period of time they were withheld from the estate. *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 1005–06 (Bankr.S.D.Ohio 1990). The good faith dispute over the funds being property of the estate does not warrant a different result. *Hunter v. Patton (In re Patton)* 200 B.R. 172, 178 (Bankr.N.D.Ohio 1996). For these reasons, the court will award Dayton Title prejudgment interest to compensate the estate for its loss of the use of the funds transferred to WFC and Wenrick while this litigation proceeded.

Although Dayton Title requested prejudgment interest to run from the date of the transfer to WFC and Wenrick, prejudgment interest is generally awarded from the date of the demand on the defendants or, absent this, the date the adversary proceeding was filed. *Suburban Motor Freight*, 124 B.R. at 1006. In this case, Dayton Title provides no demand date. Thus, the court concludes that the appropriate date for the accrual of prejudgment interest to begin is the date the adversary proceeding was initiated.

In conclusion, the court grants prejudgment interest to the Plaintiff, Dayton Title, running from the date the adversary complaint was filed on November 10, 1999. The applicable rate of interest shall be the rate set forth in 28 U.S.C. § 1961(a). *See Id.* at 1006; *Hunter v. Patton (In re Patton)*, 200 B.R. at 178; *Sicherman v. Jelm (In re Harvard Manufacturing Corp.)*, 97 B.R. 879, 884 (Bankr.N.D.Ohio.1989).

Furthermore, Plaintiff Dayton Title is awarded court filing costs. The court deems an award of attorney fees or other costs to the Plaintiff to be inappropriate.

## D. Analysis of Whether DTABT Constitutes a Business Trust in Bankruptcy

 The other issue remanded by the District Court is whether Dayton Title Agency, Inc. Business Trust ("DTABT") is a business trust so as to be eligible for separate bankruptcy relief from Dayton Title. The issue arises because only "persons" are eligible to seek bankruptcy relief. 11 U.S.C. § 109. The definition of the term "persons" includes "corporations" (see 11 U.S.C. § 101(41)) and "corporations" are, in turn, defined to include "business trusts." 11 U.S.C. § 101(9)(A)(v). However, the term "business trust" is not defined within any section of the Bankruptcy Code. Consequently federal courts generally look to either state law for a definition or they create their own.

In its first decision on summary judgment, this court concluded that DTABT was not a true business trust and was ineligible for separate bankruptcy relief from Dayton Title. To make its determination, this court looked to an unpublished Sixth Circuit opinion, *Brady v. Schilling (In re Kenneth Allen Knight Trust)*, No. 96–5353, 1997 WL 415318 (6th Cir. July 22, 1997). In this opinion, the Sixth Circuit determined that for a trust to meet the definition of a business trust it must have attributes of a corporation and be created with the primary purpose of transacting business or carrying on commercial activity for the benefit of investors. *Id.* at *3–4.

Using the Sixth Circuit's analysis, this court determined that DTABT was not a business trust because DTABT was merely the name given to Dayton Title's trust accounts and it lacked the attributes of a corporation. The evidence on summary judgment supported that DTABT had no written agreement or articles of incorporation memorializing its creation, it had no principals, officers or employees, and it had no tax identification number separate from that of Dayton Title. Furthermore, DTABT did not generate income or carry on business separate from Dayton Title.

 On appeal, the District Court vacated this court's determination and remanded the issue for this court to consider the clarification of the definition of a business trust in *Brady–Morris v. Schilling (In re Kenneth Allen Knight Trust)*, 303 F.3d 671 (6th Cir.2002), a recently published Sixth Circuit opinion. In *Brady–Morris*, the Sixth Circuit reiterated the standard articulated in its 1997 unpublished opinion (from the same case) and clarified that the standard for determining whether an entity is a business trust consists of two propositions:

> first, 'trusts created with the primary purpose of transacting business or carrying on commercial activity for the benefit of investors qualify as business trusts, while trusts designed merely to preserve the trust res for beneficiaries generally are not business trusts'; and second, 'the determination is fact-specific, and it is imperative that bankruptcy courts make thorough and specific findings of fact to support their conclusions'—findings, that is, regarding what was the intention of the parties, and how the trust operated.

*Kenneth Allen Knight Trust,* 303 F.3d at 680 (further citations omitted).

Dayton Title argues that DTABT meets this definition because the primary purpose of the trust accounts is to conduct business activity on behalf of Dayton Title and facilitate its real estate closings. In

support, Dayton Title focuses on DTABT's almost daily transactions representing the third party funds deposited into and disbursed from the trust accounts. However, these transactions denote nothing more than the obtaining and disbursing of the *trust res,* an activity which is inherent to all trusts. What Dayton Title's analysis ignores is that the type of commercial activity that separates a business trust from a trust to preserve the *trust res* is activity designed to benefit "investors." *Id.* Thus, a business trust must not only hold and disburse funds, but also be used to provide a profit to or increase in the assets of investors. *See Id., n.* 1.

Dayton Title has identified no profit-making function of the trust accounts nor any entities that could be considered investors. Dayton Title attempts to argue that it is the "investor" making a profit by earning closing fees and premiums for issuing title insurance policies. However, the funds in the trust accounts are only incidental to the profit making function of the title company itself. In fact, Dayton Title has not disputed the Defendants' contention that the title company is prohibited from using the third party trust funds for investments or the interest earned on the account for any direct profit making activity. The court agrees with the Defendants' conclusion that DTABT is nothing more than the bank accounts designed to preserve the *trust res,* i.e. to collect and disburse third party funds incidental to Dayton Title's real estate closings and title insurance business. Consequently, DTABT does not qualify as a "business trust" and its bankruptcy case is dismissed.

## CONCLUSION

In conclusion, the court makes the following determinations:

1. The third party funds, totaling $722,101.49, meet the definition of funds held in express trust for others and are excluded from Dayton Title Agency, Inc.'s bankruptcy estate. For these reasons, summary judgment must be granted to Defendants, The White Family Companies, Inc. and Nelson Wenrick, with regard to the third party funds.

2. A dispute of fact exists regarding ownership of $20,747.13 in funds existing in the account at the time of the transfers to Defendants, The White Family Companies, Inc. and Nelson Wenrick. The court denies summary judgment to all parties with regard to these funds. The issue of ownership of the $20,747.13 and whether its transfer constitutes a fraudulent conveyance must proceed to trial. The court schedules a pretrial conference on **Tuesday, May 13, 2003 at 10:00 a.m.** in its courtroom to establish a discovery deadline and trial date.

3. The factual evidence provided on summary judgment supports that National City Bank's provisional loan, amounting to $4,142,151.38, does not meet the definition of an express trust. Furthermore, National City Bank has only an unsecured claim in Dayton Title's bankruptcy for the loan proceeds. Consequently, the court concludes that the loan proceeds constitute property of the estate under 11 U.S.C. § 541 and Dayton Title retains the power to recover the proceeds from Defendants, The White Family Companies, Inc. and Nelson Wenrick, as a fraudulent transfer.

4. With regard to the proceeds from National City Bank's provisional loan, the court adopts its previous

conclusion that Dayton Title meets every element for recovery of the proceeds under the Ohio Uniform Fraudulent Transfer Act ("UFTA"), Ohio Rev.Code §§ 1336.01 *et seq.* Consequently, the court grants summary judgment to Plaintiff Dayton Title Agency, Inc., as Debtor–in–Possession, on its claim for recovery of the $4,142,151.38 in provisional loan proceeds from Defendants, The White Family Companies, Inc. and Nelson Wenrick. The court, again, determines National City Bank's separate motion for summary judgment on the same funds to be moot.

5. The judgment shall be divided between the Defendants proportionately based on the total amount each Defendant received from Dayton Title in the transfers. Defendant Nelson Wenrick's share of the judgment debt is $1,379,336.41 and Defendant The White Family Companies, Inc.'s share is $2,762,814.97.

6. The evidence provided on summary judgment supports that Dayton Title Agency, Inc. Business Trust does not meet the definition of a "business trust" for bankruptcy purposes and is ineligible to file a bankruptcy petition separate from Dayton Title Agency, Inc. Consequently, its bankruptcy case is dismissed.

7. The court grants prejudgment interest to Plaintiff Dayton Title Agency, Inc. from November 10, 1999 to the date of the judgment at the rate established in 28 U.S.C. § 1961(a) and court filing costs.

**It is so ordered.**