and this case is **REMANDED** for proceedings not inconsistent with this opinion.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0019P (6th Cir.)
File Name: 01a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

In re:  WILLIAM DUNLAP
CANNON III,

              *Debtor.*

———————————

FIRST TENNESSEE BANK,
N.A.,

              *Appellant,*

        *v.*

GEORGE W. STEVENSON,
Trustee for WILLIAM DUNLAP
CANNON III,

              *Appellee.*

No. 99-6446

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 98-02507—Julia S. Gibbons, Chief District Judge.

Argued:  October 24, 2000

Decided and Filed:  January 17, 2001

Before:  DAUGHTREY and CLAY, Circuit Judges;
RUSSELL, District Judge.[*]

_____

**COUNSEL**

**ARGUED:**    Toni  C.  Parker,  HARRIS,  SHELTON, DUNLAP,  COBB  &  RYDER,  Memphis,  Tennessee,  for Appellant.  Fred M. Acuff, Jr., HUMPHREYS, DUNLAP, WELLFORD, ACUFF & STANTON, Memphis, Tennessee, for Appellee.  **ON BRIEF:**  Toni C. Parker, HARRIS, SHELTON,  DUNLAP,  COBB  &  RYDER,  Memphis, Tennessee, for Appellant.  Fred M. Acuff, Jr., Thomas H. Fulton,  James  E.  Bailey  III,  HUMPHREYS,  DUNLAP, WELLFORD, ACUFF & STANTON, Memphis, Tennessee, for Appellee. William L. Norton III, BOULT, CUMMINGS, CONNERS  &  BERRY,  Nashville,  Tennessee,  for  Amicus Curiae.

_____

**OPINION**

_____

RUSSELL, District Judge.  In this check-kiting case that originated in the Bankruptcy Court for the Western District of Tennessee, we are faced with a collision between Article 4 of the  UCC  (and  federal  banking  regulations)  and  the Bankruptcy Code.  Appellant, First Tennessee Bank, N.A., appeals  from  the  District  Court's  order  affirming  the Bankruptcy Court's grant of summary judgment in favor of the Plaintiff/Appellee, George W. Stevenson, on Plaintiff's complaint  filed  to  recover  an  alleged  voidable  preference pursuant to 11. U.S.C. § 547 of the Bankruptcy Code.  The District  Court  concluded  that  the  Appellant's  collection efforts  under  Article  4  on  deposit  accounts  held  by  the

_____

[*] The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

alter  the  position  that  First  Tennessee  would  assume  in  a Chapter 7 proceeding.  The Trustee therefore cannot avoid the transfers, as the fifth factor of 11 U.S.C. § 547(b) is not met in the case at bar.  *See In re Frigitemp Corp.*, 34 B.R. 1000, 1015 (S.D.N.Y. 1983).

The problem with accepting the Trustee's position (as was done by the courts below) is that it would wreck Article 4's system  of  conditional  credits.  The  Trustee's  position,  by implication,  would  transfer  every  single  conditional  credit into  an  unsecured  debt,  avoidable  as  a  preferential  transfer. The result would lead to a bankruptcy decision effectively circumventing the current check clearing system set up by Article 4 and federal banking laws, especially the requirement of expedited funds availability under Regulation CC.  *See* 12 C.F.R. § 229.1 (2000).

### III.  VALUE OF SECURITY INTEREST

Section 47-4-210(a)(1) states that the security interest exists "to  the  extent  to  which  credit  given  for  the  item  has  been withdrawn or applied."  In evaluating whether or not credit has in fact been draw against, § 47-4-210(b) instructs that the "first-in,  first-out"  rule  should  be  applied.  *See*  1  Barkley Clark  &  Barbara  Clark,  *The  Law  of  Bank  Deposits, Collections, and Credit Cards*, § 5.02[3] at 5-12 (Revised Ed. 2000).  In evaluating the two accounts in question, it is clear that Cannon certainly withdrew funds in excess of the full amount  of  the  two  Hibernia  checks  between  January  10  and January 24, 1994.  Cannon wrote checks from his Real Estate Escrow Account totaling approximately $150,607.42 and was charged $57.00 in returned check fees.  This greatly exceeds the  sum  of  the  approximately  $25,666.08  on  deposit  as  of January 10 and the Hibernia check of $81,900.00.  The same pattern occurred regarding the Escrow Recording Account. Accordingly, First Tennessee's security interest in the two Hibernia checks attached to their full face value.

There is no need to address the new value exception, as the finding  that  First  Tennessee  was  fully  secured  moots  the issue.  The judgment of the District Court is **REVERSED**

of value during the time period that the bank extends provisional credit. *Brown*, 209 B.R., 887. *See also Laws*, 98 F.3d, at 1052 ("the deposited checks in an on-going check kite are not worthless, though some may be dishonored if the kite collapses"). For the period during which First Tennessee extended a provisional credit to Cannon, the kited checks are worth every penny of their face value. Cannon exercised effective control over "cash" money equivalent to the face value of the checks.

The Trustee stressed at oral argument that if the Debtor had deposited funds in his Hibernia bank account, and satisfied the delinquencies in his First Tennessee accounts through the "making good" of the Hibernia checks, First Tennessee would have a valid, unavoidable claim to the money. According to the Trustee, since the First Tennessee accounts were made whole by money from other sources, First Tennessee cannot extend its interest in the Hibernia checks to reach the funds which originated elsewhere. While this argument is compelling, it ignores the effective functioning of a valid security interest. Whether or not the Debtor satisfied the security interest by depositing the funds directly into his First Tennessee accounts, or indirectly by depositing the funds into the Hibernia account, either transaction serves to "satisfy" First Tennessee's security interest. Once Cannon entered bankruptcy, First Tennessee would be entitled to obtain the funds as a secured creditor, regardless of their location, up to the value of the checks. The focus is on whether or not First Tennessee would be a secured creditor in bankruptcy; under Article 4, it obviously would.

The security interest granted by Article 4 is designed to cover situations where the deposited check is ultimately dishonored by the drawee institution by giving the depositor bank an expansive security interest. The security interest lies in the kited check itself, as well as all of its proceeds, whatever form they might take. Thus, since First Tennessee had a valid Article 4 security interest in the Hibernia checks, the subsequent satisfaction of that security interest by the Fleet Mortgage check and First Tennessee transfer did not

Debtor, William Dunlap Cannon, III, constituted a voidable preference. Because we conclude Article 4 granted the Appellant a fully-secured interest under the Bankruptcy Code so that it would receive the same amount in a Chapter 7 bankruptcy as when it exercised its Article 4 collection rights, we **REVERSE**.

## BACKGROUND

In January and February of 1994, the Debtor, William Dunlap Cannon, III, a real estate lawyer[1] in Memphis, Tennessee, engaged in a check kiting scheme[1] involving the Appellant, First Tennessee, and two non-party banks, United American Bank of Memphis and Hibernia Bank in New Orleans. Cannon opened an account at Hibernia, and cut two courtesy checks (on which he had forged the name of a fictitious mortgage company as the account holder) to his accounts[2] at First Tennessee totaling $163,350.00 (of which the Hibernia account actually contained $7,500.00). First Tennessee extended Cannon a provisional credit for the checks on the day of the deposit, January 10, 1994, and as with any kiting scheme, Cannon immediately drew down against the provisional credit.

---

[1] "Check kiting consists of drawing checks on an account in one bank and depositing them in an account in a second bank when neither account has sufficient funs to cover the amounts drawn. Just before the checks are returned for payment to the first bank, the kiter covers them by depositing checks drawn on the account in the second bank. Due to the delay created by the collection of funds by one bank from the other, known as the 'float time,' an artificial balance is created." *United States v. Stone*, 954 F.2d 1187, 1188 n. 1 (6th Cir. 1992).

[2] Cannon actually had four (4) separate accounts at First Tennessee, titled as follows: "Real Estate Escrow Account," "Escrow Recording Account," "Trustee for Department of Housing Account," and "Law Office Account." During the transaction in question, he deposited one Hibernia check of $81,900.00 into the Real Estate Escrow Account, and one Hibernia check of $81,450.00 into the Escrow Recording Account. Prior to these fraudulent deposits, the two accounts contained $25,666.06 and $11,877.88, respectively.

First Tennessee presented the two Hibernia checks to the New Orleans Federal Reserve for clearing on the next day. On January 13, 1994, the checks were returned to First Tennessee by Hibernia for insufficient funds. First Tennessee then automatically resubmitted the checks to the Federal Reserve clearing house on January 18, 1994, to see if they would clear on the second attempt (the record indicates that 90% of checks clear on the second attempt). Hibernia returned the checks again on January 20, 1994, for insufficient funds. First Tennessee attempted to charge back the checks against Cannon's accounts, which, naturally, had insufficient funds to cover the checks. First Tennessee's automated systems then turned over the checks to a human for the first time in this saga, and on January 24, 1994, the collection officer at First Tennessee received the checks. However, on the same day, Cannon successfully covered the charge back by transferring monies to the Real Estate Escrow Account and the Escrow Recording Account from a different First Tennessee account, and from a check from Fleet Mortgage Corp., an entity unrelated to First Tennessee.[3]

About two weeks later, however, First Tennessee became more concerned with Cannon's banking activities. The record reveals that Mr. Cannon had bounced some number of checks prior to the two Hibernia checks, but that First Tennessee had taken no adverse action. During the week of February 8th, Cannon bounced over $200,000.00 in checks at First Tennessee drawn on his United American Bank accounts. An account officer at First Tennessee returned all checks presented for payment on the accounts, and terminated all of Cannon's accounts on February 17, 1994. The action of First Tennessee led to the "collapse" of the check kiting scheme, and Mr. Cannon was forced into bankruptcy.

The Chapter 7 Trustee, Appellee George Stevenson, initiated this adversary proceeding on February 21, 1996 to

---

[3]The record indicates that $81,900.00 was deposited into the Real Estate Escrow Account and $87,555.00 into the Escrow Recording Account.

---

"preferential transfers to Third National occurred after Third National had knowledge, at which point those debtors' kiting was shifted away from Third National to other banks, leaving Third National not merely in the position of an innocent depository or collecting bank but a knowledgeable third party creditor of the debtors." *Brown*, 209 B.R., at 884. Thus, while *Montgomery* provides guidance for situations where the depository or collecting bank acts with knowledge of the kiting scheme, it does not control situations such as the case at bar where the bank acts in the ordinary course of business, without knowledge of questionable banking practices by its account holder.

## II.  ARTICLE 4

Nor does *Montgomery* offer any guidance on the question of a bank's state law security interest. Tennessee Code § 47-4-210(a)(1) provides that a "collecting bank has a security interest in an item and any accompanying documents or the proceeds of either in case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied." In other words, when First Tennessee granted Cannon a provisional credit for the Hibernia checks, it received a security interest in the checks. The security interest arose by operation of law, and remained in effect until it was satisfied by Cannon's deposit from Fleet Mortgage and his transfer from another First Tennessee account. Since First Tennessee had a valid security interest, the satisfaction of that interest was not preferential under 11 U.S.C. § 547(b)(5). *See Summit Financial* 240 B.R., at 115 ("pre-petition payments to a fully secured creditor are not preferential because the creditor would not receive more than in a Chapter 7 liquidation").

The Trustee argues, as did the trustees in *Summit Financial*, *In re Brown* and *Laws*, that since the Hibernia checks were worthless when written, First Tennessee cannot have a valid security interest in the checks or their "proceeds." "It can not be said that the items supporting the various deposits before [the] collapse were worthless" as the checks have something

## I.   *IN RE MONTGOMERY*

In the present case, the courts below relied on our opinion in *In re Montgomery*, 983 F.2d 1389 (6th Cir. 1993) to avoid the transfers made to the Appellant. In the *Montgomery* case, this Court allowed the bankruptcy Trustee to avoid some three million dollars in transfers made to Third National Bank in Nashville as part of a check kiting scheme. The debtor had an elaborate system of accounts at Third National, which included a $500,000 line of credit designed to cover overdrafts. Once this was exhausted, the debtor, after negotiations with the bank, began paying "analysis charges" on his negative collected balances.[5] Third National engaged in several negotiations with the debtor, which eventually led to a phasing down of the banking scheme set up at Third National. By the time the debtor filed for bankruptcy, he had managed to zero out his balances at Third National by kiting checks against other banks. *See In Re Montgomery*, 983 F.2d, at 1390-92.

The Sixth Circuit found Third National to be a preferred creditor, and allowed the Trustee to avoid the transfers which allowed Third National to extract itself from the kiting scheme. It found that the transfers which covered provisional credits given by Third National to the debtor constituted avoidable preferences. *Id.*, at 1394. The courts below in the case at bar relied on this opinion in avoiding the transfers made to First Tennessee.

However, as has been addressed by several courts, the *Montgomery* opinion did not address the "issue of a bank's secured status in deposit items." *Brown*, 209 B.R., at 883. *See also Summit Financial* 240 B.R., at 118 n. 13. Also, the

---

[5]The collected balance refers to the balance of collected debits and credits; the ledger balance is the balance of all debits and credits, both collected and uncollected. Thus, when a bank grants a provisional credit it shows up on the ledger balance, but not the collected balance. A typical check kiter NEVER has a positive collected balance, but through the kiting scheme, manages a positive ledger balance.

---

avoid the January 24, 1994 transfers by Cannon to cover the charge backs. The Trustee claimed these were preferential transfers which unduly benefitted First Tennessee, and sought the entire $163,350.00 plus pre-judgment interest. The Bankruptcy Court agreed with the Trustee, holding that check kiting creates an antecedent debt for the purposes of the preference statute, 11 U.S.C. § 547(b). The Bankruptcy Court also found that the provisional credit extended by First Tennessee when the Hibernia checks were initially deposited was unsecured. The Bankruptcy Court also found that due to the large amount of unsecured claims against Cannon's estate, First Tennessee certainly recovered more in the January 24 transfer than it would have as an unsecured Chapter 7 creditor.

The Bankruptcy Court conducted a trial on First Tennessee's subsequent new value defense[4] as well as the amount of damages the Trustee could receive. First Tennessee argued that the subsequent new value defense applied to its dealings with Cannon since it continued to honor checks written by Cannon between January 10, 1994 (when he initially deposited the Hibernia checks) and January 24, 1994 (when he covered the charge back for the Hibernia checks with other good funds). The Bankruptcy Court agreed the new value defense applied, but only to the extent of value extended after the date of the preferential transfer. Since it fixed the date of the preferential transfer at January 24, 1994, the Bankruptcy Court found that the defense did not apply to First Tennessee's claims. The Bankruptcy Court did not

---

[4]The subsequent new value defense is found in 11 U.S.C. § 547(c)(4), which provides that a trustee may not avoid a transfer made:
to or for the benefit of a creditor, to the extent that, after such a transfer, such creditor gave new value to or for the benefit of the debtor

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

reach the issue of First Tennessee's security interest, nor did it adjust the award of damages to the Trustee.

First Tennessee appealed to the District Court, challenging the entirety of the Bankruptcy Court's conclusions. The District Court agreed that the check kiting scheme had created an antecedent debt for bankruptcy purposes under *In re Montgomery*, 983 F.2d 1398 (6th Cir. 1993). The District Court conceded that under Tennessee Code § 47-4-210, First Tennessee had a security interest in deposits made to all four accounts held by Cannon. However, since the Hibernia bank account did not contain sufficient funds to support the two checks in question, the District Court found the security interest was in nothing more than "valueless paper checks." As to the new value defense, the District Court concluded that First Tennessee continued to extend value to Cannon until it closed his accounts on February 17, 1994. Nonetheless, due to the security interest created by Tennessee state law, First Tennessee could not demonstrate the new value was unsecured for purposes of § 547(c)(4). Unlike the Hibernia checks, which had no value, the deposits taken after January 24, 1994 were secured by sufficient collateral in the form of the two deposits made on that date. First Tennessee sought an order to alter or amend, which the District Court denied for failing to meet the standards found in either Fed. R. Civ. P. 59(e) or Bankruptcy Procedure Rule 8015.

## DISCUSSION

The "collision" noted above in this case involves whether or not provisional credits allowed by Article 4 and the Expedited Funds Availability Act (12 U.S.C. §§ 4001-4010) are "debts" within the meaning of the bankruptcy code, and if they are, whether or not the satisfaction of those debts are voidable transfers. The issue of whether or not they are "debts" goes to the question of "antecedent debts," which is not necessary for the resolution of this case. The only real issue is whether or not they can be avoided. 11 U.S.C. § 547(b) allows the Trustee to avoid:

any transfer of an interest of the debtor in property--
  (1)  to or for the benefit of a creditor;
  (2)  for or on account of an antecedent debt owed by the debtor before such transfer was made;
  (3)  made while the debtor was insolvent;
  (4)  made--
      (A) on or within 90 days before the date of the filing of the petition;  or
      (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;  and
  (5)  that enables such creditor to receive more than such creditor would receive if--
      (A) the case were a case under chapter 7 of this title;
      (B) the transfer had not been made;  and
      (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

First Tennessee assumes for the purpose of arguing that the first four factors of § 547(b) have been met, and asks the Court to decide the case on the issue of being fully secured. This is the typical pattern in this area of the law. *See Laws v. United Missouri Bank of Kansas City*, 98 F.3d 1047, 1051-52 (8th Cir. 1996), *cert. denied*, 520 U.S. 1168, 117 S. Ct. 1432, 137 L. Ed. 2d 540 (1997)(finding a material issue of fact on the issue of antecedent debt, but dismissing the case on the issue of being fully secured); *In the Matter of Summit Financial Services, Inc.*, 240 B.R. 105 (Bankr. N.D. Ga. 1999)(finding the existence of antecedent debt, but denying avoidance due to being fully secured); *In re Brown*, 209 B.R. 874, 883 (Bankr. W.D. Tenn. 1997)(holding that "rather than unnecessarily decide" the issue of antecedent debt, the court would deny avoidance due to being fully secured).