# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 01-2147/02-1045/02-1491

_____

| | | |
|---|---|---|
| General Motors Acceptance Corporation, | * | |
| | * | |
| | * | |
| Appellant/Cross-Appellee, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Union Bank & Trust Company, | * | |
| | * | |
| Appellee/Cross-Appellant. | * | |

_____

Submitted: November 7, 2002

Filed: May 19, 2003

_____

Before RILEY, BEAM, and SMITH, Circuit Judges.

_____

RILEY, Circuit Judge.

General Motors Acceptance Corporation (GMAC) filed a lawsuit against Union Bank & Trust Company (Union) alleging Union converted proceeds from the sale of GMAC's collateral for its own use and benefit, and breached a Waiver of Rights of Offset Agreement (Waiver Agreement). GMAC sought compensatory and punitive damages. Following a bench trial, the district court entered judgment in favor of Union, and awarded Union costs plus 60 percent of its requested attorney fees.

GMAC appeals the judgment and the award of attorney fees. Union cross appeals the award of attorney fees. We reverse.

## I. BACKGROUND

### A. Factual Summary

Roy Crouse (Crouse) and Hurshell O'Briant (O'Briant) owned the Crouse-O'Briant automobile dealership (Dealership) in Warren, Arkansas. On September 21, 1994, GMAC, Crouse and O'Briant executed a Wholesale Security Agreement (Security Agreement). Under the Security Agreement, GMAC provided floor plan financing for the Dealership to finance its acquisition of new General Motors vehicles and used vehicle trade-ins. The Security Agreement granted GMAC a security interest in the vehicles owned by the Dealership and in the proceeds from the sale of these vehicles. GMAC perfected its security interest.

In January 1995, the Dealership opened a commercial checking account with Union. Throughout 1995, Union provided used car floor plan financing to the Dealership. When Union increased the Dealership's line of credit, GMAC required Union to sign both the Waiver Agreement and a subordination agreement. The Waiver Agreement provided Union would not offset or otherwise use for its benefit any deposits from the proceeds of collateral listed in the Waiver Agreement. Under the subordination agreement, GMAC agreed to subordinate any interest it may have in used motor vehicles financed by Union to Union's security interest in those used motor vehicles. In February 1998, when GMAC replaced Union as the Dealership's used car floor plan financier, the parties terminated the subordination agreement, but they did not terminate the Waiver Agreement.

On July 2 and 3, 1998, the Dealership deposited 15 checks drawn by The Custom Center of Savannah, Tennessee (drawer), into its checking account at Union. Union provided immediate credit to the Dealership for the July 2 and 3 deposits and

allowed the Dealership to withdraw the uncollected funds. On July 10, 1998, the drawee bank notified Union that the drawer had stopped payment on 12 of the 15 checks. The 12 dishonored checks totaled $335,345.29. The drawee bank marked "payment stopped" on the 12 dishonored checks and returned them to Union.

On July 10, 1998, when Union received the dishonored checks, the Dealership had insufficient funds in its checking account to cover a charge back of all 12 dishonored checks. Instead of charging back the dishonored checks and creating a hard overdraft in the Dealership's account, Union entered the amount of the dishonored checks as a debit to its own general ledger cash items account. On the same day, Union informed the Dealership the 12 checks had been dishonored and the Dealership needed to deposit $335,345.29 that same day to cover the provisional credit extended by Union. To meet Union's demand for immediate funds, the Dealership sold multiple General Motors vehicles and deposited $321,157.05 at Union on July 10. Of this sum, $246,500.00 represented proceeds from the sale of GMAC's collateral.

On July 13, 1998, Union recorded the Dealership's July 10 deposit as a $321,157.05 credit to its general ledger cash items account. The Dealership's deposit fell short of the dishonored checks amount by $14,188.24, and Union charged back the $14,188.24 deficit to the Dealership's checking account, which had sufficient funds to cover the charge back. On July 22, 1998, GMAC made a demand on Union for GMAC's collateral proceeds of the Dealership's July 10 deposit. Union refused the demand. The following day, at the Dealership's request, Union returned the 12 dishonored checks to the Dealership, and the Dealership closed the checking account.

**B.    Procedural Summary**

GMAC filed this action alleging Union, by crediting the Dealership's July 10 deposit to its own general ledger cash items account, converted proceeds from the sale of GMAC's collateral for Union's own use and benefit. GMAC contends it has a perfected security interest in the checks deposited on July 10, pursuant to section 4-9-302(3)(b) of the Arkansas Code Annotated. GMAC also claims Union breached the Waiver Agreement. GMAC amended its original complaint and sued Union for $246,500 plus punitive damages.

Following a bench trial, the district court entered judgment in favor of Union and against GMAC. The district court ruled Union's security interest under section 4-4-210(a)(1) of the Arkansas Code Annotated attached to the funds deposited on July 10, and the funds were proceeds of Union's security interest in the dishonored checks. The district court held Union's Article 4 security interest was superior to GMAC's Article 9 security interest. The district court also ruled GMAC's position was not supported by the Waiver Agreement. Based on parol evidence adduced at trial, the court determined the parties executed the Waiver Agreement in consideration for Union's floor plan financing of the Dealership's used cars, and the parties did not intend for the Waiver Agreement to remain in effect beyond February 1998, when GMAC took over the Dealership's used car financing.

Following entry of judgment, Union filed a motion for attorney fees under section 16-22-308 of the Arkansas Code Annotated, which allows a court to award the prevailing party reasonable attorney fees on a breach of contract claim. The court granted Union attorney fees in the amount of $111,806.25, representing 60 percent of the $186,343.75 in fees requested by Union. The court discounted the fees because part of the case arose in tort, for which fees are not recoverable. Later, the court awarded Union additional fees for defending against GMAC's post-trial motions.

## II.   DISCUSSION

### A.     Priority of Security Interests

GMAC contends the district court erred in ruling Union's Article 4 security interest was superior to GMAC's Article 9 security interest. In so ruling, the district court relied on In re Cannon, 237 F.3d 716 (6th Cir. 2001). As the district court recognized, In re Cannon did not involve a competing Article 9 interest, but rather involved a bankruptcy trustee's power to avoid preferential transfers under the Bankruptcy Code.[1]

Whether Union had a security interest in the Dealership's July 10 deposit and whether any Article 4 security interest in those funds was superior to GMAC's Article 9 security interest are questions of law which we review de novo. See Litton Indus. Automation Sys., Inc. v. Nationwide Power Corp., 106 F.3d 366, 367 (11th Cir. 1997) (whether creditor held a security interest was pure question of law); In re Brittenum & Assocs., Inc., 868 F.2d 272, 274 (8th Cir. 1989) (interpretation of bank accounts to determine whether lien rights existed was question of law).

Section 4-4-210, in relevant part, provides:

> (a)     A collecting bank has a security interest in an item and any accompanying documents or the proceeds of either:

> (1)     In the case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;

---

[1]In Laws v. United Mo. Bank, 98 F.3d 1047, 1049-52 (8th Cir. 1996), our court was presented with a similarly distinguishable case involving preferences under the Bankruptcy Code and an on-going check kiting scheme. We addressed an antecedent debt issue and recognized "deposited checks in an on-going check kite are not worthless, though some may be dishonored if the kite collapses." We now address a direct presentment to the drawee bank and competing security interests.

. . .

> (c)     Receipt by a collecting bank of a final settlement for an item is a realization on its security interest in the item, accompanying documents, and proceeds. So long as the bank does not receive final settlement for the item or give up possession of the item or accompanying documents for purposes other than collection, the security interest continues to that extent and is subject to Article 9, but:
>
> . . .
>
> (3)     The security interest has priority over conflicting perfected security interests in the item, accompanying documents, or proceeds.

Ark. Code Ann. § 4-4-210 (Michie 1991).

Relying on this statute, Union claims it held security interests in the checks the Dealership deposited on July 2 and 3, and in the checks the Dealership deposited on July 10 to cover its negative collected funds balance. A collecting bank has a security interest in any item "deposited in an account, to the extent to which credit given for the item has been withdrawn or applied." Id. § 4-4-210(a)(1). An "item" is defined as "an instrument or a promise or order to pay money handled by a bank for collection or payment." Id. § 4-4-104(a)(9). Based on these provisions, the parties agree Article 4 granted Union a security interest in the 15 checks deposited on July 2 and 3, and in their proceeds.

Union collected funds on three checks deposited on July 2 and 3, and its security interest in those three checks was self-liquidating. The drawer stopped payment on the 12 remaining checks, which caused the drawee bank to dishonor the checks and return them to Union. So long as Union did not receive final settlement for the 12 dishonored checks or give up their possession, it retained a security interest in the 12 checks with priority over conflicting security interests. Id. § 4-4-210(c).

-6-

Union never collected payment from the drawer of the 12 dishonored checks, nor did Union tender the dishonored checks to the Dealership in exchange for money or other value. On July 23, Union returned the 12 dishonored checks to the Dealership and received nothing from the Dealership in exchange for the dishonored items. Based on a plain reading of section 4-4-210(c), Union's security interest in the 12 dishonored checks terminated when it relinquished possession of the items.

Union argues its security interest in the 12 dishonored checks attached to the Dealership's July 10 deposited items, which, upon collection, became "proceeds" of the dishonored checks. Union claims the Dealership intended the proceeds of its July 10 deposit to cover most, if not all, of the Dealership's negative collected balance caused by the drawer stopping payment on 12 checks. The record supports Union's contention.

Article 4 does not define the term "proceeds" in the context of bank collection, but simply defines "proceeds" as "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral." Id. §§ 4-4-210(c), 4-9-306(1) (now codified at § 4-9-102(a)(64)(A)). The district court found Union's security interest in the dishonored checks attached to the proceeds of the items the Dealership deposited on July 10. Some courts have determined a depository bank has an expansive Article 4 security interest that may be satisfied by attaching to any funds emanating from any transaction or any source. See In re Cannon, 237 F.3d at 720-21 (by granting provisional credit, a bank has expansive security interest in a dishonored check and is entitled to satisfy its security interest with any funds transferred into the account or the proceeds of any item deposited into the account.); Schwab v. Walden Savs. Bank, 441 N.Y.S.2d 195, 196-97 (N.Y. Sup. Ct. 1981) (bank's security interest in check credited to depositor's account and proceeds of check, which was subsequently dishonored, was not defeated by depositor commingling other funds in account).

We are persuaded a better interpretation of section 4-4-210(c) limits the "proceeds" of an item (here a check), once accepted by the bank, to funds collected or exchanged for the same item. In re Stiennon, 73 B.R. 905, 908-09 (Bankr. W.D. Wis. 1987) (citing 5 Hawkland, *Uniform Commercial Code Series* § 4-208:01 (1984)). Proceeds include funds paid out by a presenting bank to the payee or funds directly received in exchange for the item. Thus, when a depository bank advances funds on checks that are never converted to proceeds because payment is stopped, the checks are dishonored and returned to the depository bank with no proceeds having been created to which a security interest can attach. See id. at 908 (holding "no proceeds are created when a check is presented for final payment and subsequently dishonored, because the check is not exchanged or disposed of for money or any other thing of value"); Bursey v. CFX Bank, 756 A.2d 1001, 1004 (N.H. 2000) (holding after drawee bank dishonored checks for lack of endorsement, depository bank received no proceeds from the wrongly accepted checks, even though depository bank later received wired funds to cover the amount of dishonored checks).

In this case, once the drawer stopped payment on the 12 checks, Union could not realize its security interest through the bank collection process. Union could only satisfy its security interest by exchanging the dishonored checks with the Dealership or the drawer for money or other value. Union could also exercise its right to charge back the dishonored checks to the Dealership's account. Union opted to do neither. When Union learned of the dishonor and the Dealership's subsequent negative collected balance, Union did not charge back the Dealership's account. Instead, when Union received the dishonored checks, Union debited its own cash items account and later credited the Dealership's July 10 deposit to the same cash items account. Ten days later, when the Dealership requested the 12 checks, Union returned them without exchanging the dishonored checks for money or other value.

-8-

We reject Union's claim that its security interest in the dishonored checks attached to the Dealership's July 10 deposit and was realized when Union collected the proceeds of the deposited items. As we view it, the Dealership's July 10 deposit was a separate transaction made on a separate date consisting of separate items collected from separate sources. Moreover, Union failed to acquire a security interest in the items the Dealership deposited on July 10 or in their proceeds because Union credited its cash items account. In doing so, Union never extended provisional credit or other value to the Dealership as required under section 4-4-210(a). Without a security interest in the Dealership's July 10 deposit or its proceeds, we conclude Union's rights were subordinate to GMAC's perfected Article 9 security interest in the proceeds of its collateral.

## B.    Waiver Agreement

GMAC claims the district court erred in relying on parol evidence to find Union and GMAC did not intend the Waiver Agreement to extend beyond February 1998, when GMAC assumed control over the Dealership's used car floor plan financing. We agree. The termination clause in the one-page Waiver Agreement is clear and unambiguous.[2] The undisputed facts establish Union and GMAC never terminated the Waiver Agreement, which applied only to the proceeds of new motor vehicles. The Waiver Agreement was clearly in effect on July 10, 1998. Union breached the Waiver Agreement when it converted proceeds from the Dealership's sale of two new motor vehicles secured by GMAC.

---

[2] The termination clause states "[t]his agreement shall remain in full force and effect until ten (10) days written notice of termination is received by GMAC from Bank."

### III.   CONCLUSION

For the reasons stated, we conclude Union converted proceeds from the sale of GMAC collateral and breached the parties' Waiver Agreement. Accordingly, we reverse and remand the case to the district court with instructions to vacate the judgment and the award of attorney fees, and to enter judgment and reasonable attorney fees in favor of GMAC. We express no view on GMAC's claim for punitive damages, leaving that matter for resolution by the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.