RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0200p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

In re: DAYTON TITLE AGENCY, INC.,

*Debtor.*

_____

THE WHITE FAMILY COMPANIES, INC.;
NELSON D. WENRICK,

*Appellees,*

v.

RUTH A. SLONE, as Trustee of the Bankruptcy
Estate of Dayton Title Agency (12-3265);
PNC BANK, NATIONAL ASSOCIATION,
successor by merger to National City Bank
(12-3359),

*Appellants.*

Nos. 12-3265;3359

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:01-cv-481—Walter H. Rice, District Judge.

Argued: January 16, 2013

Decided and Filed: July 31, 2013

Before: BATCHELDER, Chief Judge; MERRITT and KETHLEDGE, Circuit
Judges.

_____

## COUNSEL

**ARGUED:** Stephen D. Brandt, Dayton, Ohio, for Appellant in 12-3265. Marcel C.
Duhamel, VORYS, SATER, SEYMOUR AND PEASE LLP, Cleveland, Ohio, for
Appellant in 12-3359. Paul H. Shaneyfelt, DUNGAN & LEFEVRE CO., L.P.A., Troy,
Ohio, for Appellee White Family Companies in 12-3265 and 12-3359. Dianne F. Marx,
SEBALY SHILLITO + DYER, Dayton, Ohio, for Appellee Wenrick in 12-3359.
**ON BRIEF:** Stephen D. Brandt, Dayton, Ohio, for Appellant in 12-3265. Marcel C.
Duhamel, Heather M. Lutz, VORYS, SATER, SEYMOUR AND PEASE LLP,
Cleveland, Ohio, Terry M. Miller, VORYS, SATER, SEYMOUR AND PEASE LLP,
Columbus, Ohio, for Appellant in 12-3359. Paul H. Shaneyfelt, DUNGAN &
LEFEVRE CO., L.P.A., Troy, Ohio, for Appellee White Family Companies in 12-3265

1

and 12-3359. Dianne F. Marx, SEBALY SHILLITO + DYER, Dayton, Ohio, for Appellee Wenrick in 12-3359.

BATCHELDER, C. J., delivered the opinion of the court in which, MERRITT and KETHLEDGE, J.J., joined. MERRITT, J. (pp. 17–18), delivered a separate concurrence.

––––––––––––––––

**OPINION**

––––––––––––––––

**I.**

ALICE M. BATCHELDER, Chief Judge. Dayton Title Agency (Dayton Title) was a small company that brokered financial transactions, primarily real estate closings. As part of its operation, it had an "IOTA" (Interest on Trust Account) banking account at PNC Bank (then National City Bank)[1] to hold clients' funds in trust as money was passed from one party to the other in a transaction.

Dayton Title facilitated a series of loans that the defendants, White Family Companies ("White") and Nelson Wenrick, made to one Krishan Chari and his business partner Michael Karaman, as well as to their corporate interests, The Chari Group, Ltd., and Invesco, LLC, (collectively, "Chari"). During 1998 and 1999, White made a series of five short-term "bridge loans" to Chari, ranging from $1.9 million to $3.2 million, for 30 to 45 days, to facilitate specific commercial real estate purchases by Chari. Wenrick made a sixth bridge loan to Chari for $1.2 million in 1999. In all these transactions, the lender would deposit the funds into Dayton Title's PNC account and Dayton Title would then transfer the funds to Chari. Chari's loan payments would also pass through Dayton Title's account. These first six loans "were paid back in full, but not always before the due dates." *In re Dayton Title Agency, Inc.*, 292 B.R. 857, 863 (Bankr. S.D. Ohio 2003).

White and Wenrick each provided another bridge loan to Chari in September of 1999, for $3.2 million and $1.6 million, respectively, or $4.8 million total. *Id.* Chari

––––––––––

[1] PNC bought out National City Bank, which was the bank that actually participated in these facts, and took over this dispute from National City. For simplicity, we refer to PNC throughout.

agreed to pay back the loans, with interest, by October 3, 1999.  Several days after the deadline Chari paid back the loans, but both checks bounced because of insufficient funds.  Finally, on October 19, Chari deposited a check for the full amount owed ($4.885 million once interest was accounted for) into Dayton Title's trust account at PNC.  "The check was purportedly drawn on a[n] . . . account at Oak Hill Bank.  The teller at [PNC] did not place a hold on the check Chari deposited."  *Id.* at 864.

Continuing in its role as intermediary, Dayton Title "[o]n that same day" and "pursuant to Chari's instructions" issued checks to White and Wenrick.  *Id.*  On October 20, PNC extended a "provisional credit" to Dayton Title for $4.885 million (the face value of Chari's check), pursuant to PNC's standard "Rules for Business Accounts."  Banks routinely extend these credits to a customer's checking account while a check is clearing, allowing the funds from the check to be "available" before the check has been fully processed (this is discussed more fully below).  White exchanged its check from Dayton Title for an official bank check on October 20.  Wenrick deposited his check at another bank and it cleared on October 25.  On October 26, PNC learned that Chari's check was a forgery drawn on a non-existing account at another bank.  Chari deposited two additional checks in Dayton Title's account in the subsequent weeks, but both were returned for insufficient funds.

PNC then exercised its right of "charge back" on the Dayton Title account.  There was about $740,000 already in the account (made up of third-party funds and Dayton Title's fees for other transactions) when Dayton Title deposited Chari's check.  The provisional credit from PNC added $4.885 million to the account (the face value of the check).  The payments to White and Wenrick then debited $4.885 million from the account, leaving $740,000.  Because of the "first-in first-out" rule, the $4.885 million paid to White and Wenrick was made up of the $740,000 already in the account and about $4.1 million from the provisional credit funds.  PNC's charge-back debited $4.885 million.  PNC regained about $740,000 of the provisional credit funds it advanced and left Dayton title with a negative balance of about $4.1 million.  It is the

roughly $4.1 million from the provisional credit funds, which were subsequently transferred to White and Wenrick, that is contested on appeal.

PNC froze Dayton Title's account on November 4, and Dayton Title was forced into bankruptcy. Chari and his corporate entities declared bankruptcy and Chari was convicted on charges of racketeering, fraud, and forgery. After Dayton Title filed for bankruptcy, the bankruptcy estate sued White and Wenrick, seeking to avoid the $4.885 million transfer to those parties as a fraudulent transfer under federal and state law. *See* 11 U.S.C. § 548; Ohio Rev. Code § 1336.04(A)(2). PNC intervened as an additional plaintiff, suing White and Wenrick for fraudulent transfer and unjust enrichment. The bankruptcy court held that all but $722,101.49 of the transfer to White and Wenrick was fraudulent. On appeal, the district court held that all but $20,747.13 of the transfer was *not* fraudulent. The Dayton Title estate and PNC now appeal.

## II.

When a case originates in bankruptcy court, we review the decision of the bankruptcy court directly. *See Stevenson v. J.C. Bradford and Co.*, 277 F.3d 838, 849 (6th Cir. 2002) (*In Re Cannon II*). We give no deference to the opinion of the district court. *Id.* Because we review a grant of summary judgment here, we review the bankruptcy court's decision de novo. *Id.*

The only question on appeal is whether that portion of the payment to White and Wenrick that was drawn from the money that PNC had advanced was an "asset" of Dayton Title for purposes of Ohio's fraudulent transfer statute. Federal bankruptcy law allows a claimant to bring a fraudulent transfer claim under both federal and state law. A federal claim is brought under 11 U.S.C. § 548. A state fraudulent transfer claim may be brought in a bankruptcy case under 11 U.S.C. § 544 and the applicable state provision. *See In re Fordu*, 201 F.3d 693, 697 n.3 (6th Cir. 1999) ("The section 544 'strong-arm' provision of the Code allows the trustee to 'step into the shoes' of a creditor in order to nullify transfers voidable under state fraudulent conveyance acts for the benefit of all creditors.").

Here, Dayton Title appeals under 11 U.S.C. § 544 and the Ohio Uniform Fraudulent Transfer Act (UFTA). *See* Ohio Rev. Code § 1336.01 *et. seq.* In Ohio, a transfer is fraudulent as to a creditor if:

> (1) It is "[a] transfer made or an obligation incurred by a debtor,"
> (2) "the debtor made the transfer or incurred the obligation . . . [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation," and
> (3) "either of the following applies:  (a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; (b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

Ohio Rev. Code § 1336.04(A)(2).

Both the district court and the bankruptcy court found that the second and third elements of the claim are satisfied here, and we agree. Dayton Title did not receive a "reasonably equivalent value" in exchange for its payments to White and Wenrick. As the bankruptcy court explained, the transfer "created $4,885,000.00 in new claims against Dayton Title that did not exist prior to the transfer." *In re Dayton Title Agency, Inc.*, 262 B.R. 719 (Bankr. S.D. Ohio 2001). Dayton Title received nothing of value in return for the transfer; nor was the transfer made to satisfy any obligation of Dayton Title, because Chari, not Dayton Title, owed the money to White and Wenrick.

The transaction also left Dayton Title with remaining assets that were unreasonably small in relation to the business or transaction. *See id*. at 732. In fact, the transaction left Dayton Title some $4.1 million in debt. Again, "[t]he transfer not only depleted Dayton Title's assets, but left it unable to continue in business." *Id.* at 733.

It is the first element of the claim–whether the transaction was a "transfer" for purposes of the Ohio statute–that is at issue in this appeal.

## III.

The question in this case is whether the payments made to White and Wenrick qualify as a "transfer made . . . by the debtor." A "transfer" is defined as a means of disposing of an "asset." *See* Ohio Rev. Code § 1336.01(L). An "asset" is defined as "property of a debtor." *See* Ohio Rev. Code § 1336.01(B). The definition of an asset excludes, however, all of the following:

> (1) Property to the extent it is encumbered by a valid lien;
> (2) Property to the extent it generally is exempt under nonbankruptcy law, including, but not limited to, section 2329.66 of the [Ohio] Revised Code;
> (3) An interest in property held in the form of a tenancy by the entireties created under section 5302.17 of the [Ohio] Revised Code prior to April 4, 1985, to the extent it is not subject to process by a creditor holding a claim against only one tenant.

*Id.* The primary question on appeal is whether White and Wenrick received Dayton Title's "assets," because these plaintiffs may bring a fraudulent transfer claim only for assets that belonged to Dayton Title.

For purposes of this question, the bankruptcy court split the $4.885 million payment to White and Wenrick into three parts: (1) $20,747.13 in the account that constituted fees and expenses owed to Dayton Title in connection with various real estate closings; (2) $722,101.49 that Dayton Title was holding in its account on behalf of third parties at the time of the transfer; and (3) $4,142,151.38 that came from PNC's provisional credit and resulted in a negative balance on Dayton Title's account when PNC charge-backed the credit after the check was returned. *In re Dayton Title Agency, Inc.*, 292 B.R. 857, 864, 870 (2003). Both the bankruptcy court and the district court held that the first part–Dayton Title's fees–is property of the estate, and that portion of the transfer is fraudulent. Both courts also held that the second part–the third party trust funds–is not property of the estate, and that portion of the transfer is not fraudulent. These conclusions are not challenged by the parties. Only the third part–the transfer of the provisional credit funds–is disputed in this appeal.

White and Wenrick argue that the provisional credit funds are not the assets of Dayton Title: (A) the funds are trust funds belonging to a third party, or, alternatively, (B) the funds are subject to PNC's valid lien on the fraudulent check.

**A.**

The first argument is that the provisional credit funds transferred from Dayton Title to White and Wenrick were trust funds and, therefore, were not the "assets" of Dayton Title. The lower court opinions and the briefs primarily struggle with the application of *Stevenson v. J.C. Bradford and Co.*, 277 F.3d 838 (6th Cir. 2002) (*In re Cannon II*). *Cannon II* grappled with the definition of "property of the estate" in a federal fraudulent transfer claim, not a state claim. We note, however, that at least one Ohio bankruptcy court has found the federal and state claims to be "substantially similar." *See In re Grove-Merritt*, 406 B.R. 778, 789 (Bankr. S.D. Ohio 2009). The bankruptcy court here applied *Cannon II* without questioning the federal-state distinction because the district court had remanded the case to the bankruptcy court specifically for consideration of *Cannon II*, finding that *Cannon II* applied based on the reasoning of *Grove-Merritt*.

The court in *Cannon II* found that "property of the estate" included only "that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings. . . . '[B]ecause the debtor does not own an equitable interest in property he holds in trust for another, that interest is not property of the estate.'" *Cannon II*, 277 F.3d at 849 (quoting *Begier v. IRS*, 496 U.S. 53, 58-59 (1990)). Thus, assets held in trust are excluded from the debtor's estate and are not subject to fraudulent transfer claims because the holder of a trust has only legal title. *Id.* State law determines whether an asset is held in trust. *Id.*

Under Ohio law a trust is created when there is:

[1] an explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created, [2] accompanied with an intention to create a trust, [3] followed by an actual conveyance or transfer of lawful, definite property or estate or interest, made by a

person capable of making a transfer thereof, for a definite term,
[4] vesting the legal title presently in a person capable of holding it.

*Ulmer v. Fulton*, 195 N.E. 557, 564 (Ohio 1935).  The existence of a trust must be shown by clear and convincing evidence.  *Hill v. Irons*, 113 N.E.2d 243, 248 (Ohio 1953).

The provisional credits in this case were not held in trust for a third party under Ohio law.  At first glance, both of the first two elements of a trust appear to be satisfied here:  Dayton Title established a trust account, evidencing an intention to create a trust. Dayton Title intended to create a trust relationship with Chari.  However, there is no trust here because there was no actual conveyance from Chari to Dayton Title.  Dayton Title received the funds *from PNC* as part of its contractual banking agreement with PNC.  Dayton Title did *not* receive the funds from Chari—Chari's check bounced, so Chari put no funds into Dayton Title's account.

And while PNC did in fact actually convey funds to Dayton Title, PNC did not place those funds in trust.  There was never an explicit declaration of trust by PNC nor are there circumstances showing that PNC intended to place property in trust.  There is no evidence that Dayton Title intended to hold property from PNC in trust.  There may have been an actual conveyance between PNC and Dayton Title, but the first two elements are not satisfied.  Nor, importantly, can the transfer from PNC to Dayton Title vest legal title in Dayton Title and vest equitable title in White and Wenrick.  Dayton Title could be obligated to pay the funds to White and Wenrick only if the funds had come from Chari.

White and Wenrick argue that Dayton Title was so obligated:  because Dayton Title would have been obligated to pay Chari's check to White and Wenrick, Dayton Title should hold the provisional credits in trust as well.  But again, Chari never conveyed any funds to Dayton Title.  As the bankruptcy court put it:  "the trust relationship, if one had been created, would have been between Chari and Dayton Title and, then, only to the extent Chari's check resulted in a lawful conveyance of property. Because this did not occur, no trust relationship was created."  *In re DTA*, 292 B.R. at 872.

The district court nonetheless held that *Cannon II* demanded a different conclusion. Cannon was a Tennessee attorney who did a high volume of real estate closings, averaging over 100 closings a month, and who had between $5 and $10 million flowing through his trust accounts each month as a result. *Cannon II*, 277 F.3d at 843. Cannon embezzled money from the accounts and kited checks as well.[2] *Id*. at 844. At some point, Cannon also deposited personal funds into the trust account in an attempt to hide the scheme. *Id*. at 851. After Cannon was caught and filed for bankruptcy, a federal fraudulent transfer suit was brought against the investor to whom he had paid much of the embezzled funds. An accounting of the embezzled funds estimated that 83% of them were real estate closing funds taken from Cannon's clients, 15% could be traced to check kiting, and about 0.5% was traceable to Cannon's personal assets. *Id*. at 846.

The court in *Cannon II* made three separate holdings, all based on Tennessee law. First, "the funds Cannon held in escrow for his clients were without question maintained in an express trust" under Tennessee law. *Id.* at 850. Because they were trust funds, the funds held in escrow were outside the estate and not subject to the fraudulent transfer statute. Second, the court considered the personal funds that Cannon had deposited into the trust account. The court decided that the personal funds had become part of the escrow account because they were restitution for misappropriated funds. *Id*. at 851 (citing G.G. Bogert, et al., The Law of Trusts and Trustees § 929 ("Deposits as restorations of trust funds after misappropriation") (rev. 2d ed. 1984)). Third, the court held that the funds misappropriated from the escrow accounts were considered converted under Tennessee law. Since "one who obtains property by conversion acquires no title, voidable or otherwise," any misappropriated funds could not be part of Cannon's estate. *Id*.[3]

---

[2]Check kiting is an illegal scheme that takes advantage of the lag time between when the bank advances provisional credit for a check and when the bank receives final payment for the check.

[3]It is unclear from the context whether this holding is meant to apply to the trust funds of third parties or to the money obtained through check kiting. *Cannon II*, 277 F.3d at 850. What is clear is that one of these three holdings was applied to provisional credits obtained through check kiting; thus, we consider the applicability of all three holdings to this case.

In the present case, the district court reasoned that the provisional credit funds that Cannon received as part of his check-kiting scheme were analogous to the provisional credit funds Dayton Title received as a result of Chari's fraudulent check. The district court explained:

> Of particular present pertinence is the Sixth Circuit's conclusion that $1,137,500 in Cannon's trust accounts was not property of his bankruptcy estate, even though that sum was based on provisional credits made as a result of a check kiting scheme. Similarly, herein, [the bank] made provisional credits to DTA's trust account, based upon the deposit therein of a forged check.

The district court concluded that the provisional credits here must also be trust funds. While the similarities between the two cases are facially appealing, the district court's argument overlooks important differences.

None of the holdings in *Cannon II* applies to the provisional credit funds here. As explained above, the provisional credit funds here were *not* held in trust for a client or any other third party. Dayton Title never received any funds from Chari. Nor are the provisional credits analogous to the personal funds Cannon placed in his trust account as restitution. Dayton Title never misappropriated funds in the first place, so these provisional funds from PNC cannot be restitution. Finally, the provisional credits are not analogous to the funds converted by Cannon. The provisional credits were placed in Cannon's account as a result of his own wrongdoing, whereas here the provisional credits were placed in Dayton Title's account through no wrongdoing of its own. So where in *Cannon II* the court asked whether, under state law, Cannon converted the funds or obtained them by fraud, we never reach that question here because Dayton Title obtained the funds legitimately. This case was set in motion by Chari's fraud, but Dayton Title obtained the funds according to the terms of its contract with PNC, not by conversion or fraud.

In sum, *Cannon II* is simply inapposite here. Dayton Title did not hold the provisional credit funds in trust.

**B.**

Next, White and Wenrick argue and the district court held that Dayton Title had only legal title and not equitable title to the transferred funds because PNC had a security interest in the funds.  Under the U.C.C. as adopted in Ohio, PNC is both the "depositary bank" ("the first bank to take an item") and a "collecting bank" ("a bank handling the item for collection except the payor bank").  *See* Ohio Rev. Code § 1304.01(B)(2) and (5).  As a collecting bank, PNC arguably had a security interest in the funds under Ohio Rev. Code § 1304.20, which codifies U.C.C. § 4-210.  That section provides as follows:

> (a) A collecting bank has a security interest in an item and any accompanying documents or the proceeds of the item or documents in any of the following manners:
>> (1) In the case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;
>> (2) In the case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given, whether or not the credit is drawn upon or there is a right of charge-back;
>> (3) If it makes an advance on or against the item.
> (b) If credit given for several items received at one time or pursuant to a single agreement is withdrawn or applied in part, the security interest remains upon all the items, any accompanying documents, or the proceeds of either.  For the purpose of this section, credits first given are first withdrawn.
> (c) Receipt by a collecting bank of a final settlement for an item is a realization on its security interest in the item, accompanying documents, and proceeds.  So long as the bank does not receive final settlement for the item or give up possession of the item or possession or control of the accompanying documents for purposes other than collection, the security interest continues to that extent and is subject to Chapter 1309[] of the Revised Code, except for all of the following:
>> (1) No security agreement is necessary to make the security interest enforceable under division (b)(3)(a) of section 1309.203 of the Revised Code.
>> (2) No filing is required to perfect the security interest.
>> (3) The security interest has priority over conflicting perfected security interests in the item, accompanying documents, or proceeds.

U.C.C. § 4-210, *codified at* Ohio Rev. Code § 1304.20. A collecting bank receives a security interest in a check (the "item") and its proceeds to the extent it advances a provisional credit to a depositor's account in recognition of that check, if the depositor can withdraw those funds "as of right." *Id*. at (a)(2). The security interest is in the check itself and its proceeds; White and Wenrick argue that the security interest is also in the provisional credit funds.

The U.C.C. implies in subsection (c) above that the security interest plays an important role in recovering the bank's provisional extension of funds, but it is unclear *how* it plays such a role.[4] The district court agreed with White and Wenrick that the U.C.C. security interest extends to the provisional funds:

> Although the failure of [PNC] to claim a security interest could have affected its recovery during [Dayton Title's] bankruptcy proceedings, [PNC] nevertheless had a security interest in the *funds from forged checks* Chari wrote on a closed account, by operation of law, pursuant to § 1304.20(A)(1). Therefore this Court agrees with the alternative premise of White and Wenrick that [Dayton Title] had nothing more than mere legal title to the *funds that were transferred* from its trust account to them, given that [PNC] had a security interest in those funds.

The district court here treats the "funds that were transferred" to White and Wenrick as equivalent to the "funds from forged checks." In the language of Ohio Rev. Code § 1304.20, the district court treats the transferred provisional credit funds as the "proceeds" of the forged checks, and so gives PNC a security interest in the transferred provisional credit funds. Thus, since the provisional credit funds cannot be an "asset" of Dayton Title "to the extent [they are] encumbered by a valid lien," the transfer to White and Wenrick by Dayton Title could not be invalidated as a fraudulent transfer under Ohio law. *See* Ohio Rev. Code § 1336.01(B). We disagree with the district court

---

[4]Subsection (c) provides that the security interest continues if there is no final settlement of the check, and notes that no filing or security agreement is necessary to perfect the interest. Ohio Rev. Code § 1304.20(c). This "correlates the security interest with the provisions of Article 9, particularly for use in the cases of noncollection in which the security interest may be important." *Id.* comm. 3. Elsewhere, the U.C.C. clearly states that a person with a security interest under U.C.C. § 4-210 is a secured party under Article 9. U.C.C. § 9-102 (73).

because the text of Ohio Rev. Code § 1304.20 simply does not support the idea that the provisional credit funds are the proceeds of the check.

Understanding how a successful check collection works provides a framework for analyzing the unsuccessful check collection here. The collection process can be viewed as a principal-agent or debtor-creditor relationship and can be conceptually divided into three steps.[5] In the initial transaction, the depositor presents the check to the bank, and the bank takes the check and agrees to act as the collecting agent for the depositor. As Ohio Rev. Code § 1304.20 explains, the bank may also advance to the depositor a provisional credit for the face value of the check and receive a security interest in the check (the "item" in § 1304.20) and its proceeds. The second step in the process is the collection of the check. The depositor's bank will pass along the check, usually through one or more intermediary banks, until it reaches the bank of the check-writer. That bank then withdraws the funds from the check-writer's account and passes those funds back along the collection chain to the depositor's bank. The third step is the "second transaction" between the depositor and the depositor's bank, which is often invisible to the depositor. The depositor's bank receives the funds from the check, keeps these funds in satisfaction of its security interest, and converts the provisional credit to the final payment (or "final settlement") to the depositor.[6] When a check cannot be collected, the bank can revoke the provisional credit and "charge back the amount of any credit given for the item to its customer's account." Ohio Rev. Code § 1304.24(A).

Here, the transfer to White and Wenrick occurs during step two–while the check is being collected by PNC. PNC does have a security interest in Chari's bad check because the first step of the check collection–i.e., the deposit of that check into Dayton

---

[5]"Subsection (a) states a rational rule for the interest of a bank in an item. The customer of the depositary bank is normally the owner of the item and the several collecting banks are agents of the customer (Section 4-201). A collecting agent may properly make advances on the security of paper held for collection, and acquires at common law a possessory lien for these advances." Ohio Rev. Code § 1304.20, comm. 1.

[6]"Collection statistics establish that the vast majority of items handled for collection are in fact collected. The first sentence of subsection (c) reflects the fact that in the normal case the bank's security interest is self-liquidating." Ohio Rev. Code § 1304.20 comm. 3. "In due course the provisional settlements become final simply with the lapse of time." Ohio Rev. Code § 1304.24 comm. 1.

Title's PNC account–has been completed. That security interest is worth the value of the provisional credit, approximately $4.1 million. Although the check is worthless in hindsight, and so the security interest may seem worthless in hindsight, the Sixth Circuit has found that the security interest is worth as much as the bank "lent out" in provisional funds. *See First Tennessee Bank v. Stevenson*, 237 F.3d 716, 721 (6th Cir. 2001) (*In Re Cannon I*). "For the period during which [the bank] extended a provisional credit . . . the kited checks are worth every penny of their face value . . . [because the depositor] exercised effective control over 'cash' money equivalent to the face value of the checks." *Id.* at 721. The text of the U.C.C. demands this interpretation because it clearly contemplates a security interest that survives noncollection of the check. The *First Tennessee* court explained: "The security interest granted by article 4 is designed to cover situations where the deposited check is ultimately dishonored by the drawee institution by giving the depositor bank an expansive security interest. The security interest lies in the kited check itself, as well as all of its proceeds, whatever form they might take." So PNC does have a security interest in the check under Ohio Rev. Code § 1304.20, which codifies U.C.C. § 4-210.

However, the provisional credit funds are not the "proceeds" of the check here. First, there is no express textual support for concluding that they are proceeds. Ohio Rev. Code § 1304.20 clearly grants PNC a security interest in the check itself and in its proceeds when PNC extends the provisional credit. It mentions nothing about a security interest in the funds PNC is extending.

Second, the initial transaction–where PNC receives Chari's check from Dayton Title and extends provisional credit in return–cannot be the transaction that makes the provisional funds "proceeds" of the check. "Proceeds" include the following:

> (A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
> (B) whatever is collected on, or distributed on account of, collateral;
> (C) rights arising out of collateral;
> (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or

> (E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

U.C.C. § 9-102(a)(64), *codified at* Ohio Rev. Code § 1309.102(a)(64).  Whether the provisional credit may be labeled "proceeds" of the check later in the collection process when the check clears and the provisional credit automatically becomes the final payment on the check, it can only become the proceeds of the check as a result of that collection process and the "second transaction" with the depositor.  It cannot become proceeds as the result of just the initial transaction.  The check is not "collateral" for the provisional credit until the initial transaction is completed.  So while the provisional credit is acquired in "exchange" for the check or "distributed on account of" the check, that check is not collateral until after the provisional credit has been extended.  Looking at the initial transaction in isolation, there is no reason to believe that PNC receives a security interest in the money it advances.  This was the *only* transaction that had been completed by the time Dayton Title transferred the funds to White and Wenrick.  Since the initial transaction did not extend PNC's security interest to the provisional funds, PNC did not have a lien on the funds, and the funds were the property of Dayton Title.

Third, there is no support for the idea that the bad check here had "proceeds" at all.  The check was fraudulent, written on a non-existing account.  While it is true that U.C.C. § 4-210(c) presumes that even uncollected checks can have "proceeds," there is no reason why *this* uncollected check must have proceeds.  A fraudulent check, drawn on a non-existent account, is unlikely to have proceeds.

This holding is consistent with *First Tennessee*, despite that case's declaration of an "expansive security interest" in a check and its "proceeds, whatever form they might take." *First Tennessee Bank*, 237 F.3d at 721.  *First Tennessee* makes this broad claim in a context very different from the context here.  First Tennessee Bank was able to recover its provisional credit through its right of charge-back, after the depositor had transferred funds back into the depositing account.  The depositor's bankruptcy estate later sued the bank seeking to avoid the charge-back as a preferential transfer.  *First*

*Tennessee* simply holds that the bank still had a security interest under U.C.C. § 4-210 despite the bounced check, that the security interest was for the full amount of the provisional credit, and that the bank was thus a preferred creditor.[7]

The only instance where any court has found provisional credits to be the proceeds of a bad check is when a bank has passed the check on to another bank along the collection chain and in return received provisional credit for the check from that collecting bank. *See, e.g.*, *Laws v. United Mo. Bank of Kan. City*, 98 F.3d 1047, 1052 (8th Cir. 1996). Such a situation is distinguishable from this case. In a case such as *Laws*, a bank receives a security interest from its transaction with the depositor. It then receives the provisional credit in a second transaction with the collection-chain bank and so may be able to consider the result of the second transaction to be "proceeds" of the check.

Thus, the provisional credit funds were not encumbered by a lien at the time of transfer and they *were* "assets" held by Dayton Title as that term is defined by Ohio's fraudulent transfer act. *See* Ohio Rev. Code § 1336.01(B). Because Dayton Title transferred assets of its estate to White and Wenrick and that transfer satisfies the other elements of a fraudulent transfer claim under Ohio Rev. Code § 1336.01 *et. seq*., we hold that the transfer of the provisional credit funds was fraudulent and remand this case for action consistent with this opinion.

## IV.

For the foregoing reasons, we **REVERSE** the judgment of the district court and **AFFIRM** the judgment of the bankruptcy court.

---

[7]Even without a security interest directly in the provisional credit, there are a number of ways that a bank can regain those funds. The bank's security interest makes the bank a creditor of the depositor, allowing the bank to pursue the depositor directly. The bank's right of charge back gives the bank access to any funds in the depositor's account, and its security interest protects the bank against preference actions, as it did in *First Tennessee*. *See* U.C.C. § 4-214, *codified at* Ohio Rev. Code § 1304.24. Finally, its continued interest in the check itself gives the bank access to the account of the check-writer (although here that account is non-existent).

---

**CONCURRENCE**

---

MERRITT, Circuit Judge, concurring.  I agree with the court's opinion but write to make what may be an obvious point that the result is fair between the parties and would be the result at common law without bringing the Uniform Commercial Code into the picture.

Though on the surface it may seem unfair to penalize White and Wenrick by taking back the money, in reality their business was with Chari, not with Dayton Title, and they would never have had this money in the first place had they been dealing with Chari directly.  Similarly, if Dayton Title had simply indorsed the check to White and Wenrick without the bank's intervention, then White and Wenrick would have had nothing but a worthless check.  So there is no unfairness when White and Wenrick are required to return money they would not have received in the absence of the bank deposit and the way bank deposits are treated by the commercial check-deposit law.

If any party besides Chari is to blame, one might blame the bank, which could have prevented this mess by refusing to extend to Dayton Title the provisional credit and by waiting for Chari's check to clear.  But our commercial law, in order to facilitate commerce, gives bank customers instant access to deposits, and a victory for the defendants here would undermine that purpose.

The defendants think Dayton Title had only a legal interest in these funds because Chari intended to create a trust.  But Chari intended nothing of the sort.  He intended only to create a fraud.  Dayton Title was able to transfer funds from its account to the defendants because the bank offered it a provisional credit, not because Chari put funds into the account.  Moreover, the provisional credit was unencumbered by a lien, contrary to the defendants' second theory of why the provisional credit does not qualify as property.  Under U.C.C. § 4-210, the bank has a lien on the check itself and its proceeds—which were nonexistent here—but not the provisional credit.  The bank has avenues to collect the value of a provisional credit, such as charging back the customer's

account, but a lien on the provisional credit is not one of them.  So I agree with the outcome of this case not simply because of a linguistic analysis of the interlocking state and federal statutes, but also because the result makes good sense as a matter of fairness between the parties and good commercial policy.